[No. 75771-2.   En Banc.]
Argued June 28, 2005.     Decided March 16, 2006.

THE STATE OF WASHINGTON, *Petitioner*, v. JONATHAN A. BISSON, *Respondent*.

*Norm Maleng, Prosecuting Attorney*, and *Andrea R. Vitalich, Deputy*, for petitioner.

*Wayne C. Fricke*; *Monte E. Hester*; and *Eric J. Nielsen* (of *Nielsen, Broman & Koch, P.L.L.C.*), for respondent.

¶1 OWENS, J. — Defendant Jonathan Bisson pleaded guilty to five counts of first degree robbery and three counts of second degree robbery. The State conceded that Bisson's plea agreement was involuntary because he had not been clearly informed that the five deadly weapon enhancements applicable to the first degree counts had to be served consecutively to one another. At issue is the remedy for Bisson's involuntary plea. The State contends that his only remedy is withdrawal of the entire plea (complete rescission), but Bisson maintains that he may withdraw the plea to the deadly weapon enhancements only, while letting stand the plea to the underlying offenses (partial rescission), or that, in the alternative, he may receive a sentence imposing concurrent enhancements (specific performance). The Court of Appeals concluded that Bisson was not entitled to specific performance but that he could partially withdraw his plea agreement if he could establish on

remand that he had personally perceived his plea to the enhancements to be separable from his plea to the underlying crimes. *State v. Bisson*, noted at 121 Wn. App. 1035, 2004 Wn. App. LEXIS 962, at *2.

¶2 We agree with the State that Bisson was not entitled to the remedies of partial rescission or specific performance. The Court of Appeals decision is thus reversed in part and affirmed in part. On remand, the trial court should permit Bisson to withdraw his plea in its entirety.

## FACTS

¶3 Bisson was charged with a string of robberies committed between November 2001 and January 2002, the first occurring at a flower shop and the others at espresso stands. In the second amended information, the State charged Bisson with five counts of first degree robbery and three counts of second degree robbery, pursuant to RCW 9A.56.200(1)(b), .210, and .190. Each of the five first degree counts included an allegation that Bisson had been armed with a deadly weapon—identified as a hammer in three counts, a knife in the other two.

¶4 On June 13, 2002, when his case was called for trial, Bisson pleaded guilty to the eight counts. As required under CrR 4.2(g), Bisson completed a "Statement of Defendant on Plea of Guilty," a form document bearing handwritten responses that Bisson had initialed.[1] The prosecutor handed the statement on the plea to the trial judge and also submitted the State's second amended information and the State's one-page "Plea Agreement." Verbatim Report of Proceedings (VRP) (June 13, 2002) at 8; Clerk's Papers (CP) at 43-46, 58. As indicated in the plea agreement, the State attached to the agreement the sentencing guidelines scor-

---

[1] *See* Clerk's Papers (CP) at 30-40. CrR 4.2(g) requires a defendant entering a guilty plea to file a written statement "in substantially the form set forth" in the rule.

ing forms and a form setting forth the prosecutor's under-standing that Bisson had no prior criminal history.[2]

¶5 Bisson's statement on the plea incorporated informa-tion provided in the documents the State submitted—the State's second amended information, the State's plea agree-ment, and the sentencing guidelines scoring forms accom-panying the plea agreement. Bisson acknowledged that he had been charged with, and was pleading guilty to, the crimes set forth in the second amended information. *See* CP at 30, 38. Consistent with the scoring forms, Bisson's statement on the plea entered "129-171" as the standard range for the five first degree robbery counts and "63-84" as the standard range for the three second degree robbery counts. *Id.* at 31, 60-61. As for the applicability of deadly weapon enhancements, the statement on the plea indicated that no enhancements were applicable to the second degree robbery counts but recorded that the first degree counts carried enhancements of "24 months on each count; 5 counts total." *Id.* at 31. That entry accurately repeated the information provided on the State's calculation sheet for the deadly weapon enhancements. There, the five first degree robbery counts are treated collectively as the "CURRENT OFFENSE BEING SCORED"; the "BASE STANDARD SENTENCE RANGE" is defined as "129 to 171," the "DEADLY WEAPON ENHANCEMENT" as "24," and the resulting "STANDARD RANGE" as "153 to 195." *Id.* at 62.

¶6 Consistent with the State's second amended informa-tion and its plea agreement with accompanying scoring sheets, the statement on the plea did not state that the five 24-month weapon enhancements were to run *consecutively to one another*. Just as the State's plea agreement provided that any mandatory enhancements "must be served *con-secutively to any other term* and without any earned early release," *id.* at 58 (emphasis added), the preprinted form for the statement on the plea provided that "[t]his additional

---

[2] The scoring forms were drawn from the Washington State Sentencing Guide-lines Commission, *Adult Sentencing Guidelines Manual* (2001), *see* CP at 60-62, while the criminal history form was jointly credited to the King County Prosecutor and the Department of Corrections. *See* CP at 59.

confinement time is mandatory and must be served *consecutively to any other sentence* I have already received or will receive in this or any other cause." *Id.* at 35 (emphasis added). Moreover, the calculation sheet for the deadly weapon enhancement folded the enhancements into the sentencing computation to produce a higher "STANDARD RANGE" for each of the five counts; because, by statute, those counts run concurrently, the scoring sheet obscured the requirement that the enhancements be served consecutively to one another. *Id.* at 62; *see* RCW 9.94A.589.

¶7 Bisson's statement on the plea indicated that, at the time of the entry of the plea on June 13, 2002, the State was leaving "open" its recommended sentence. CP at 33, 58. At the oral presentation of the plea on that day, the trial court confirmed Bisson's understanding that he was pleading guilty "to Counts I through VIII of the Second Amended Information" and that, in light of the "open recommendation," "the prosecutor at the time of sentencing can recommend anything *up to the standard range.*" VRP (June 13, 2002) at 9-10 (emphasis added). Formally accepting Bisson's plea, the trial judge stated that he had "signed the Statement of Defendant on Plea of Guilty and the Plea Agreement." *Id.* at 11; *see* CP at 40, 58.

¶8 When the sentencing hearing began seven weeks later on August 2, 2002, the prosecutor began by reporting that defense counsel had brought to his attention a citation error in the second amended information, the information on which Bisson had based his previously entered guilty plea. In the information, the State had incorrectly cited the deadly weapon statutes as RCW 9.94A.125 and .310—provisions that had actually been recodified in July 2001 as RCW 9.94A.602 and .510, respectively. The State's plea agreement likewise incorrectly cited RCW 9.94A.310; because the prosecutor had used a form last revised in July 2000, the form incorrectly used citations predating the July 2001 recodification. CP at 58. Although the substance of the statutes had not changed in 2001, the legislature had changed RCW 9.94A.310 in 1998 in response to this court's decision in *In re Post Sentencing Review of Charles,* 135

Wn.2d 239, 955 P.2d 798 (1998), in which we held that former RCW 9.94A.310(3)(e) (1995) did not unambiguously require weapon enhancements to run consecutively to one another.[3] Defense counsel explained to the court that Bisson had relied on the citation of RCW 9.94A.310 in the second amended information when exploring case law on his own: "[Bisson] has been citing me cases and saying, look at this case, look at this case, and look at this case. And the cases he is talking about are the line of supreme court and appellate cases that say that deadly weapon enhancements run concurrent. . . . Under his version he is looking up an old case law and under the statute which was cited in the amended information. And that's what he was relying on. . . . So I understand the basis for my client's confusion on that subject."[4] While the State characterized the mistake as a harmless scrivener's error, defense counsel moved to dismiss the weapons allegations without prejudice, stating that Bisson had understandably believed the enhancements would run concurrently with one another and that, even if the citations had been correct, the information's description of the deadly weapons was factually insufficient. The trial court granted the State's motion to correct the citation and denied Bisson's motion.

¶9 The State then went on to recommend at the August 2 sentencing hearing, orally and in writing, that Bisson receive base sentences of 150 months on each of the five first degree robbery counts and 75 months on each of the

[3] *Charles*, 135 Wn.2d at 250. Former RCW 9.94A.310(3)(e) and (4)(e) (1995) contained the same language: "[E]nhancements . . . are mandatory, shall be served in total confinement, and shall not run concurrently with any other sentencing provisions." *See* LAWS OF 1998, ch. 235, § 1.

[4] VRP (Aug. 2, 2002) at 9-10; *see also id.* at 3-4. While former RCW 9-.94A.310(3)(e) and (4)(e) (1998) provided that firearm and deadly weapon enhancements were to "run consecutively to all other sentencing provisions, including other firearm or deadly weapon enhancements," former RCW 9.94A.310 (1995) remained in effect for sentencing in cases where the events predated the 1998 amendments; consequently, cases filed after 1998 could cite RCW 9.94A.310 and authorize concurrent sentences for weapon enhancements. *See, e.g., State v. Price*, 103 Wn. App. 845, 859-60 & n.6, 14 P.3d 841 (2000) (agreeing that firearm enhancements under former RCW 9.94A.310(3)(e) (1996) should be served concurrently with one another since events occurred in 1997).

three *second degree robbery* counts, with the base sentences on all eight counts to run concurrently. *See* VRP (Aug. 2, 2002) at 13-14; CP at 63-64. The State's sentencing recommendation stated that each of the five first degree robbery counts carried a mandatory 24-month deadly weapon enhancement. Although the recommendation form stated that the five enhancements would be "served consecutive *to any other term of confinement,*" it did not specify that the enhancements would be *consecutive to one another.* CP at 64. Nor did the State's oral presentation clarify that the enhancements were to run *consecutively to one another*: "As the Court knows the deadly weapon enhancements run consecutive to the 150-month sentence." VRP (Aug. 2, 2002) at 13.

¶10 The trial court reduced the State's 75-month recommendation to 63 months on each of the three second degree robbery counts and similarly reduced the 150-month recommendation to 129 months on each of the five first degree robbery counts. When the trial court initially announced its sentencing decision, the court was under the impression that the 24-month enhancements would also be served concurrently:

> And on the counts [for first degree robbery, I am going to set the term of confinement at] 129 months plus the deadly weapon enhancement, for a total of 153 . . . . Now, that basically is the low end of the standard range with the enhancement. And some people may think that these crimes, particularly those who went through them, might deserve more, but people often do. And just so that the record is clear, Mr. Bisson is going to serve 153 months, in excess of 12 years in prison.

*Id.* at 39-40. A colloquy with defense counsel and the prosecutor followed, *see id.* at 40-43, clarifying that Bisson's 129-month sentences for the five first degree robbery counts would run concurrently, that they would run concurrently with the likewise concurrent 63-month terms for the three second degree crimes, and that an additional 120 months (for the five consecutive 24-month enhancements) would follow, for a total period of confinement of 20 years and 9

months—not 12 years and 9 months, as the court had first assumed.

¶11 Bisson timely appealed the judgment and sentence. On March 3, 2003, the trial court granted Bisson's request for appointed counsel to investigate and litigate a motion, pursuant to CrR 7.8, to withdraw his guilty plea, and on March 21, the Court of Appeals granted Bisson's motion to stay appellate proceedings pending the trial court's ruling on the anticipated motion to withdraw the plea. Bisson filed the motion in superior court on June 11, 2003, and two days later, filed in the Court of Appeals a personal restraint petition; two months later, Bisson amended the petition, adding claims that his counsel had been ineffective and that the police had unlawfully obtained evidence against him. On July 1, 2003, the trial court granted the State's motion to transfer the CrR 7.8 motion to the Court of Appeals for consideration as a personal restraint petition. All three matters were thereafter consolidated for hearing in the Court of Appeals.

¶12 In his September 22, 2003, opening brief, Bisson assigned error, first, to the trial court's acceptance of his plea of guilty to the deadly weapon enhancements and, second, to the trial court's decision transferring to the Court of Appeals his motion to withdraw the guilty plea. Bisson contended that "there was no factual basis to support the enhancements" and that he had been "misinformed of the length of the sentence based on the enhancements." Br. of Appellant/Pet'r at 1. As to a remedy, he argued that he "should be allowed to withdraw his plea to the deadly weapon enhancements or, in the alternative, [that the court] should direct the trial court to enter an order running the enhancements concurrently" under the doctrine of specific performance. *Id.* at 19. On November 5, 2003, the State filed a motion conceding that Bisson's plea was involuntary: "[U]nless the record demonstrates that Bisson understood that his weapon enhancements would be consecutive to the base sentence and to one another, Bisson's plea is involuntary. Unfortunately, the record indicates quite the

opposite. . . . [T]he record contains no information with which to refute Bisson's claim that he misunderstood the direct consequences of his plea." Resp't's Mot. To Concede Error at 5-6. Disputing Bisson's entitlement to specific performance, the State asked the Court of Appeals to instruct the trial court on remand "that Bisson *may withdraw his plea in its entirety." Id.* at 10 (emphasis added).

¶13 In an unpublished per curiam decision, the Court of Appeals accepted the State's concession that Bisson's plea had not been voluntary and agreed with the State that specific performance was not an available remedy. *Bisson,* 2004 Wash. App. LEXIS 962, at *1-2. As to whether the agreement could be partially rescinded (Bisson's alternative request) or had to be rescinded in its entirety (as the State maintained), the court concluded that "[t]he correct remedy . . . depend[ed] upon Bisson's personal perception of the severability of his decision to plead guilty to the underlying offenses from his decision to plead guilty to the weapons enhancements." *Id.* at *8. The court thus remanded the matter for the trial court "to ascertain Bisson's choice in this regard." *Id.*

¶14 Having moved unsuccessfully for reconsideration, the State sought this court's review of the Court of Appeals opinion and the order denying reconsideration. In Bisson's response to the petition, he renewed his argument that, contrary to the Court of Appeals decision, "specific performance should be available as a remedy in this case." Resp. to Pet. for Review at 12. We granted review at 154 Wn.2d 1012 (2005).

## ISSUES

¶15 1. Is partial rescission an available remedy for Bisson's involuntary plea, allowing him to withdraw his plea only as to the weapon enhancements, or is the remedy of rescission restricted to withdrawal of the plea agreement in its entirety?

¶16 2. In light of the State's erroneous citations in the second amended information and the plea agreement, as

well as the State's concession that nothing in the record clearly informed Bisson at the time of his plea that the five weapon enhancements would be served *consecutively to one another*, should the ambiguity regarding the weapon enhancements be construed against the State, entitling Bisson to a sentence imposing concurrent terms for the five weapon enhancements?

## ANALYSIS

█ ¶17 *Standard of Review*. Because a plea agreement is a contract, issues concerning the interpretation of a plea agreement are questions of law reviewed de novo. *State v. Harrison*, 148 Wn.2d 550, 556, 61 P.3d 1104 (2003); *Tyrrell v. Farmers Ins. Co. of Wash.*, 140 Wn.2d 129, 133, 994 P.2d 833 (2000).

█ ¶18 *Available Remedies for Involuntary Plea Agreement*. For a defendant's guilty plea to be deemed voluntary and valid, the "defendant must understand the sentencing consequences" of his plea. *State v. Miller*, 110 Wn.2d 528, 531, 756 P.2d 122 (1988); *State v. Turley*, 149 Wn.2d 395, 398-99, 69 P.3d 338 (2003). Here, conceding that Bisson did not understand that the five deadly weapon enhancements were to run consecutively to one another, the State agreed that Bisson's plea was involuntary and that he was entitled to a remedy. This court has held that "where the terms of a plea agreement conflict with the law or *the defendant was not informed of the sentencing consequences of the plea*, the defendant must be given the initial choice of a remedy *to specifically enforce the agreement or withdraw the plea*." *Miller*, 110 Wn.2d at 536 (emphasis added); *Turley*, 149 Wn.2d at 399. After the defendant's election, the burden shifts to the State:

> Although the defendant has the *initial* choice of remedy, the trial court is not necessarily bound by the defendant's choice. Once the defendant has opted for one of the available remedies, the State "bears the burden of demonstrating that the defendant's choice of remedy is unjust." [*Miller*, 110 Wn.2d] at 536.

> The State's burden requires a showing that compelling reasons exist not to allow the defendant's choice. *Id.* at 535. We hold that when the plea agreement includes multiple counts or charges, the State need not make a showing of compelling reasons on each count or charge. Instead, the showing may be based on any one or all of the counts or charges. The trial court then determines whether those reasons are compelling and the defendant's choice of withdrawal or specific performance is unjust.

*Id.* at 401. While the State may ordinarily "make its showing on remand," the *Turley* court concluded that, because the State had not provided "compelling reasons [in its briefing or at oral argument] to refuse Turley's choice of remedy, Turley [was] permitted to withdraw his plea of guilty [to both counts]." *Id.*; *see also In re Pers. Restraint of Isadore*, 151 Wn.2d 294, 303, 88 P.3d 390 (2004) (concluding that, because the State "ha[d] not objected to the defendant's chosen remedy and in oral argument could not assert any reasons why specific performance would be unjust," Isadore was entitled to specific performance of the original sentence).

¶19 While the State argues that the sole available remedy is the withdrawal of Bisson's entire plea (complete rescission), Bisson contends that he should be permitted to choose between the two remedies: the withdrawal of the plea to the enhancements only (partial rescission of the agreement) or a sentence imposing concurrent terms for the weapon enhancements (under the doctrine of specific performance). This court has, in fact, recently considered the narrower question of whether the remedy of withdrawal necessarily means withdrawal of the plea in its entirety. In *Turley*, the defendant had pleaded guilty to two counts and been sentenced to concurrent terms with no community placement. When the State learned more than three years later that one of the two charges carried a mandatory 12-month term of community placement, the State moved to amend the judgment and sentence. The trial court declined to permit Turley to withdraw his plea in its entirety, concluding instead that he was entitled to with-

draw only the plea to the charge that carried community placement. The *Turley* court held that the trial court could not permissibly "grant or deny a motion to withdraw a plea agreement *as to each count separately when the defendant pleaded guilty to multiple counts entered the same day in one agreement.*" 149 Wn.2d at 398 (emphasis added). Agreeing with Turley "that the plea agreement was one bargain or, as the defendant puts it, a 'package deal,'" the court "h[e]ld that a trial court *must* treat a plea agreement as *indivisible* when pleas to multiple counts or charges were made *at the same time*, described *in one document*, and accepted *in a single proceeding.*" *Id.* at 400 (emphasis added). A defendant who is able to show involuntariness as to *one* sentencing element in an *indivisible* plea agreement "may move to withdraw the plea agreement or have specific performance of the agreement." *Id.* Consistent with the *Turley* court's insistence on the objective interpretation of the plea agreement, this court subsequently "decline[d] to adopt an analysis" that would make the determination of the voluntariness of a defendant's plea dependent upon "the defendant's subjective decision to plead guilty." *Isadore*, 151 Wn.2d at 302. As the *Isadore* court observed, "[a] reviewing court cannot determine with certainty how a defendant arrived at his personal decision to plead guilty, nor discern what weight a defendant gave to each factor relating to the decision." *Id.*

¶20 In light of the bright-line rule stated in *Turley*, we hold that if Bisson initially elects the remedy of withdrawal of the plea agreement, the remedy is restricted to the withdrawal of his plea in its entirety. Under *Turley*, Bisson's plea agreement can be regarded only as "indivisible"—"a 'package deal'"—since the pleas to the eight counts and the five weapon enhancements were made contemporaneously, set forth in the same document, and accepted in one proceeding. 149 Wn.2d at 400. Contrary to the analysis below, our prior decisions in *Turley* and *Isadore* make irrelevant "Bisson's personal perception of the severability of his decision to plead guilty to the underlying

offenses from his decision to plead guilty to the weapons enhancements." *Bisson*, 2004 Wn. App. LEXIS 962, at *8. In sum, as the State maintains, Bisson may elect to withdraw the plea in its entirety, but he may not withdraw his plea to the weapon enhancements alone and let stand his plea to the underlying offenses.[5]

¶21 In the alternative, Bisson contends that, with the trial court's acceptance of his plea on June 13, 2002, he was entitled to the remedy of specific performance, as guaranteed in *Miller*: "[T]he integrity of the plea bargaining process requires that *once the court has accepted the plea, it cannot ignore the terms of the bargain*, unless the defendant . . . chooses to withdraw the plea." 110 Wn.2d at 536 (emphasis added); *see also Harrison*, 148 Wn.2d at 556-57 (observing that, because plea agreements are contracts that "concern fundamental rights of the accused, they also implicate due process considerations that require a prosecutor to adhere to *the terms of the agreement*" (emphasis added)). A defendant is entitled to specific performance of the plea agreement, even "where the terms of a plea agreement conflict with the law." *Miller*, 110 Wn.2d at 536; *see, e.g., Isadore*, 151 Wn.2d at 302-03 (permitting defendant to request specific performance of a plea agreement that erringly failed to include a mandatory term of community placement); *State v. Cosner*, 85 Wn.2d 45, 51-52, 530 P.2d 317 (1975) (allowing reduction in defendants' mandatory minimum terms "in accordance with their understanding of the length thereof at the time of their pleas"). In Bisson's view, a sentence running the five weapon enhancements concurrently with one another was an enforceable

---

[5] To the extent Division One's earlier decision in *State v. Zumwalt*, 79 Wn. App. 124, 901 P.2d 319 (1995), conflicts with *Turley*, we disapprove *Zumwalt*. There, having determined that Zumwalt's plea to a deadly weapon enhancement had been factually inadequate under CrR 4.2(d) and was thus involuntary, the court permitted Zumwalt to enter a new plea to the enhancement. *Id.* at 132. Because Zumwalt "presented no basis for challenging his plea to the charge of first degree robbery," the court let stand "[t]hat portion of the plea." *Id. Zumwalt* predates our decision in *Turley* and is, in any case, distinguishable since it did not raise the issue of the severability of the plea agreement.

"term[ ] of the bargain," despite being in "conflict with the law." *Miller*, 110 Wn.2d at 536.

¶22 While the plea agreement indisputably included a promise of five 24-month enhancements, at issue is whether *concurrent* weapon enhancements constituted a term of the plea agreement that the trial court accepted on June 13, 2002. The State conceded that "Bisson was never advised that the enhancements would run consecutively to one another" and that the record contained nothing to refute Bisson's expectation that the enhancements would run concurrently. *Bisson*, 2004 Wn. App. LEXIS 962, at *4; Resp't's Mot. To Concede Error at 5-6. That the State's errors left this term of the plea agreement ambiguous finds support in several respects. First, a correct citation of RCW 9.94A.510 in the second amended information and the plea agreement, instead of the erroneous citation of RCW 9.94A.310, would have eliminated any possible confusion regarding earlier cases that cited RCW 9.94A.310 and provided for concurrent enhancements. Second, rather than clarifying that the weapon enhancements would run consecutively to one another, the weapon enhancement scoring sheet attached to the plea agreement did not clarify that the weapon enhancements would run consecutively to one another but simply added a 24-month enhancement to the standard range of 129-171 months to arrive at a higher "STANDARD RANGE" of 153-195 for each of the five counts, which by statute run concurrently. CP at 62; *see* RCW 9.94A.589. Finally, the trial court, having accepted Bisson's guilty plea, interpreted the plea agreement and accompanying documents as providing for concurrent weapon enhancements; the trial court's initial belief supports Bisson's view that he was promised concurrent enhancements or that, at the very least, "the State prepared [an] agreement [that] allows for concurrent deadly weapon enhancements." Resp. to Pet. for Review at 12.

¶23 The narrower question, then, is whether, in light of the State's responsibility for the ambiguity in this "term[ ] of the bargain," the ambiguity "should be construed against

the State and to the benefit of Mr. Bisson." *Id.* Bisson relies on the principle "that contract language subject to interpretation is construed most strongly against the party who drafted it, or whose attorney prepared it." *Guy Stickney, Inc. v. Underwood*, 67 Wn.2d 824, 827, 410 P.2d 7 (1966); *see* Resp. to Pet. for Review at 12 (citing *Lynott v. Nat'l Union Fire Ins. Co.*, 123 Wn.2d 678, 690, 871 P.2d 146 (1994)). Supporting the application of that principle to the interpretation of a plea agreement (albeit *against* the defendant), Bisson cites *State v. Skiggn*, 58 Wn. App. 831, 795 P.2d 169 (1990). Resp. to Pet. for Review at 12. The *Skiggn* court held that "it would be unfair to the State and, indeed, unjust to now allow Skiggn specific enforcement of an alleged plea agreement which was based entirely on erroneous information for which his attorney was primarily responsible." 58 Wn. App. at 838. A more pointed application of the rule is found in *State v. Lathrop*, 125 Wn. App. 353, 363, 104 P.3d 737 (2005). There, the prosecutor and defense counsel jointly recommended a 90-month sentence for an offense with a standard range of 95-125 months. When an error in the offender score later came to light, resulting in a lower standard range sentence, the defendant argued that he was entitled to a sentence five months lower than the new standard range. The court concluded that "[t]he relevant plea language" provided specifically for a 90-month sentence and that, even if the language were deemed ambiguous, "any ambiguity would be resolved against" the defendant because his attorney was the drafter. *Id.* at 362-63. Bisson contends that, just as under *Skiggn* and *Lathrop* this rule of contract interpretation has been cited to the defendant's detriment, here it should be no less applicable to the State's disadvantage.

¶24 Case law from other jurisdictions supports Bisson's view that the ambiguity rule should be applied to the interpretation of his plea agreement. In *United States v. Harvey*, 791 F.2d 294 (4th Cir. 1986), at issue was whether a plea agreement had promised that the defendant would not be subject to further prosecution. The court observed

that "both constitutional and supervisory concerns require holding the Government to a greater degree of responsibility than the defendant (or possibly than would be either of the parties to commercial contracts) for imprecisions or ambiguities in plea agreements." *Id.* at 300. The court added that the requirement was "particularly appropriate where, as will usually be the case, the Government has proffered the terms or prepared a written agreement—for the same reasons that dictate that approach in interpreting private contracts." *Id.* at 301. The *Harvey* court held that the plea agreement provision "was, first off, imprecise or ambiguous as a matter of law" and that, given the foregoing principle, "the provision must be read against the Government." *Id.* at 301, 303; *see also Mayes v. Galley,* 858 F. Supp. 490, 497 (D. Md. 1994) (identifying available remedies for breach of a plea agreement as withdrawal of the plea or "specific enforcement of the plea agreement construing ambiguities against the State"). Similarly, as the Supreme Court of Kansas reasoned, construing an ambiguity in a plea agreement against the State is consistent with the rule of lenity applied to ambiguous statutes:

> A plea agreement reasonably susceptible to different interpretations is ambiguous. The plea agreement in the instant case is reasonably susceptible to different interpretation and is therefore ambiguous. Where a statute is ambiguous, we require that it be strictly construed in favor of the accused. *State v. Magness,* 240 Kan. 719, 721, 732 P.2d 747 (1987). We find no compelling reason to adopt a different rule in interpreting ambiguous plea agreements.

*State v. Wills,* 244 Kan. 62, 69, 765 P.2d 1114 (1988); *see State v. Tvedt,* 153 Wn.2d 705, 711, 107 P.3d 728 (2005) (applying rule of lenity to ambiguous criminal statute).

¶25 While we strongly discountenance the State's failure to clarify at the time of the plea agreement that weapon enhancements must be served consecutively to the underlying sentences and to one another, we decline to hold that specific performance is an available remedy for an ambiguous provision in a plea agreement. In the commercial

context, "[i]t is well established that a contract, oral or otherwise, is not subject to specific performance unless the precise act sought to be compelled is clearly ascertainable." *Emrich v. Connell*, 105 Wn.2d 551, 558, 716 P.2d 863 (1986). This principle has been recognized in the context of plea agreements. *See State v. E.A.J.*, 116 Wn. App. 777, 784, 67 P.3d 518 (2003) (quoting *Emrich*, 105 Wn.2d at 558), *review denied*, 150 Wn.2d 1028 (2004); *State v. Armstrong*, 109 Wn. App. 458, 468, 35 P.3d 397 (2001) (Quinn-Brintnall, J., dissenting) (quoting *Emrich*, 105 Wn.2d at 558, and contending that "the performance the State seeks is not sufficiently ascertainable from the [plea] agreement to be determined and enforced by the court"). In prior Washington cases addressing the remedy for an involuntary plea agreement, courts have upheld specific performance of a term of the agreement only where the prosecutor's promise was not susceptible to more than one meaning. *See, e.g., Cosner*, 85 Wn.2d at 50-51 (enforcing provision of plea agreement that erroneously reduced the defendants' mandatory minimum sentence from seven and one-half years to five years); *Harrison*, 148 Wn.2d at 556 (enforcing State's promise to base its sentencing recommendation on offender score of seven, despite later discovery that score should have been eight); *Isadore*, 151 Wn.2d at 297, 303 (permitting specific performance of prosecutor's erroneous representations in the plea agreement and before the trial court that no mandatory term of community placement applied). In contrast to cases in which the State made clear but legally inaccurate promises in a plea agreement, here the State has conceded only that the provision regarding weapon enhancements was not precise enough to refute Bisson's claimed belief that the enhancements were to run concurrently with one another. Just as specific performance was a viable remedy in those cases where the State erroneously indicated that a mandatory minimum was five years, that an offender score was seven, and that an offense carried no term of community placement, specific performance would have been an available remedy here had the State expressly promised Bisson that his five 24-month weapon

enhancements would be served concurrently. However, because the State has conceded nothing more than uncertainty in the provision and because we find the State's concession reasonable, the specific performance that Bisson requests must be denied.

## CONCLUSION

¶26 The State conceded that Bisson's plea was involuntary. To remedy an involuntary plea agreement, a defendant is ordinarily entitled to make the initial choice between withdrawal or specific performance of the agreement. Consistent with our decision in *Turley* and contrary to the resolution proposed in the Court of Appeals decision below, we hold that if Bisson elects the remedy of withdrawal, he may not withdraw his plea to the weapon enhancements alone but must withdraw his plea in its entirety.

¶27 Regarding the alternative remedy of specific performance, we hold as a matter of law that the plea agreement was ambiguous as to whether Bisson's five weapon enhancements were to be served consecutively to, or concurrently with, one another. While the State specifically conceded that "none of the documents submitted at the time of Bisson's plea clearly stated that the weapon enhancements would be consecutive to one another," Resp't's Mot. To Concede Error at 6, the State also correctly maintained that the plea agreement had not precisely provided that the enhancements would run concurrently with one another. Adhering to the principle that an ambiguous contract provision is not subject to specific performance, we affirm the Court of Appeals decision to deny Bisson's request for a sentence running the five 24-month enhancements concurrently.

¶28 The Court of Appeals decision is therefore reversed in part and affirmed in part. We remand the matter to the trial court with instructions to permit Bisson to withdraw his plea in its entirety. As the Court of Appeals determined, Bisson's ineffective assistance claim need not be addressed

in light of the State's concession that the plea was involuntary, and if Bisson elects to withdraw his plea in its entirety, the claim that the police illegally obtained evidence against him may be raised before trial in a motion to suppress.

ALEXANDER, C.J., and MADSEN, BRIDGE, CHAMBERS, FAIRHURST, and J.M. JOHNSON, JJ., concur.

¶29 SANDERS, J. (dissenting) — Jonathan Bisson pleaded guilty to five counts of first degree robbery, three counts of second degree robbery, and five deadly weapon enhancements. His plea was involuntary because he reasonably believed the deadly weapon enhancements would run concurrently to one another. But the majority concludes Bisson is not entitled to specific performance of the plea agreement he reasonably believed he made, asserting it was ambiguous as to whether the deadly weapon enhancements would run concurrently or consecutively.

¶30 Due process requires construction of ambiguous plea agreements against the State and in accordance with a criminal defendant's reasonable expectations. Bisson quite reasonably expected his deadly weapon enhancements to run concurrently with one another. And he is entitled to specific performance of that expectation.

¶31 As the majority recognizes, a plea agreement is a contract with the State and due process entitles a criminal defendant to specific performance, even if its terms conflict with the law. Majority at 520. *See, e.g., State v. Miller*, 110 Wn.2d 528, 536, 756 P.2d 122 (1988); *State v. Harrison*, 148 Wn.2d 550, 556-57, 61 P.3d 1104 (2003); *In re Pers. Restraint of Isadore*, 151 Wn.2d 294, 302-03, 88 P.3d 390 (2004); *State v. Cosner*, 85 Wn.2d 45, 50-51, 530 P.2d 317 (1975).

¶32 The majority concedes Bisson's plea agreement implied his deadly weapon enhancements would run concurrently to one another. Majority at 511, 521. It concedes the State erroneously cited a superseded statute we construed as authorizing deadly weapon enhancements to run

concurrently to one another. Majority at 512-13, 521. It concedes the State failed to specify Bisson's deadly weapon enhancements would run consecutively to one another in its sentencing recommendation. Majority at 513-14, 521. It concedes the State failed to specify Bisson's deadly weapon enhancements would run consecutively to one another in its oral presentation at his sentencing hearing. Majority at 514-15, 521. It concedes the trial court assumed Bisson's deadly weapon enhancements would run concurrently to one another. Majority at 514-15, 521. It concedes Bisson had no idea his deadly weapon enhancements would run consecutively to one another until the State asked the trial court to amend its sentencing judgment. Majority at 514-15, 521. It concedes contracts—including plea agreements—are construed against the drafting party, in this case the State. Majority at 521-22. It concedes plea agreements are construed against the government. Majority at 522-23. And it concedes the rule of lenity supports construing ambiguous plea agreements against the State. Majority at 523. And yet, inexplicably, it concludes Bisson is not entitled to specific performance of the plea agreement he quite reasonably believed he made because it was "ambiguous" as to whether his deadly weapon enhancements would run concurrently or consecutively to one another. Majority at 523-24.

¶33 It is axiomatic that due process requires courts to construe any ambiguity in a plea agreement against the government and in accordance with the defendant's reasonable understanding of the agreement. *See, e.g., United States v. Roitman*, 245 F.3d 124, 126 (2d Cir. 2001); *United States v. Baird*, 218 F.3d 221, 229 (3d Cir. 2000); *United States v. Harvey*, 791 F.2d 294, 303 (4th Cir. 1986); *United States v. Melton*, 930 F.2d 1096, 1097-98 (5th Cir. 1991); *United States v. Randolph*, 230 F.3d 243, 248 (6th Cir. 2000); *United States v. Rourke*, 74 F.3d 802, 805 (7th Cir. 1996); *United States v. Coleman*, 895 F.2d 501, 505 (8th Cir. 1990); *United States v. Camarillo-Tello*, 236 F.3d 1024, 1026 (9th Cir. 2001); *United States v. Peterson*, 225 F.3d 1167, 1171 (10th Cir. 2000); *United States v. Nyhuis*, 8 F.3d 731,

741-42 (11th Cir. 1993). *See also*, Lisa B. Eisen & Ian R. Rooney, *Annual Review of Criminal Procedure: Guilty Pleas*, 90 GEO. L.J. 1477, 1481 & n.1237 (2002). The majority cites no authority to the contrary.

¶34 When the State relies on a statute authorizing an enhanced sentence, "due process of law requires that the information contain specific allegations to that effect, thus putting the accused person upon notice that enhanced consequences will flow with a conviction." *State v. Cosner*, 85 Wn.2d at 50. Failure to provide such specific notice requires the State "to reduce their mandatory minimum terms in accordance with their understanding of the length thereof at the time of their pleas." *Id.* at 51-52.

¶35 Therefore the State " 'must bear responsibility for any lack of clarity' " in Bisson's plea agreement, not Bisson. *United States v. De La Fuente*, 8 F.3d 1333, 1338 (9th Cir. 1993) (quoting *United States v. Anderson*, 970 F.2d 602, 607 (9th Cir. 1992), *amended on reh'g*, 990 F.2d 1163 (1993)). If Bisson's plea agreement was ambiguous, *as the majority concedes*, he is entitled to specific performance of the plea agreement he reasonably believed he made. In other words, Bisson is entitled to serve his deadly weapon enhancements concurrently, not consecutively.

¶36 I dissent.

C. JOHNSON, J., concurs with SANDERS, J.