*This opinion is subject to revision before final publication in the Pacific Reporter.*

**2016 UT 30**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

SIRQ, INC., a Utah Corporation, and ALAN J. PETERSON,
*Appellees,*

*v.*

THE LAYTON COMPANIES, INC., a Utah Corporation, and LAYTON
CONSTRUCTION CO., a Utah Corporation,
*Appellants.*

No. 20140136
Filed July  1, 2016

On Direct Appeal

Third District, Salt Lake
The Honorable Todd M. Shaughnessy
No. 070908853

Attorneys:

Maralyn M. English, D. Jason Hawkins,
Salt Lake City, for appellees

Robert S. Clark, Jeffrey J. Hunt, James L. Ahlstrom,
David C. Reymann, Austin J. Riter Salt Lake City, for appellants

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court,
in which JUSTICE PEARCE, JUDGE VOROS, JUDGE ORME, and
JUDGE ROTH joined.

Having recused themselves, CHIEF JUSTICE DURRANT,
JUSTICE DURHAM, and JUSTICE HIMONAS did not participate herein;
JUDGE J. FREDERIC VOROS, JUDGE GREGORY K. ORME, and JUDGE
STEPHEN ROTH of the Utah Court of Appeals sat.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1   This is a business tort suit between a large construction company and a break-off company founded by a former president of the larger entity. The claimants in the suit are Alan Peterson and SIRQ, Inc. Peterson is a former president of The Layton Companies, Inc. and Layton Construction Co. (Layton). He had a falling out with Layton management in 2002 and later founded SIRQ, a competing construction company.

¶2   Layton's relationship with SIRQ and Peterson quickly soured. Layton eventually asked applicants for management positions to sign an agreement not to enter into business with SIRQ or Peterson. It also circulated a memorandum explaining its basis for requesting signatures on that agreement, which made statements that SIRQ and Peterson found objectionable. In time SIRQ and Peterson each sued Layton for intentional interference with economic relations and "false light" invasion of privacy.

¶3   A theme at trial on these claims was the allegation by Peterson and SIRQ that Layton exhibited a malicious, wrongful intent in its interactions with its former president and the company he founded. That allegation formed a key basis of the claims for tortious interference. Understandably so. At the time of trial in this case, our law of intentional interference recognized two separate branches of a claim for intentional interference—one based on a showing of improper *means* and another based on proof of improper *purpose*. *See Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982).

¶4   SIRQ and Peterson emphasized the allegation of improper purpose throughout trial. From opening statements to direct- and cross-examination of most of the witnesses, counsel drew the jury's attention to Layton's alleged animosity toward Peterson and SIRQ and to its motive of driving them out of business. The point was likewise emphasized in closing argument. And the jury was instructed that it could base a determination of tortious interference on a showing of *either* improper means *or* improper purpose.

¶5   That instruction was correct when it was given. But in the interim, while this case was pending on appeal, we revised the

common law of intentional interference with economic relations. In *Eldridge v. Johndrow* we eliminated the improper purpose branch of the tort of intentional interference with economic relations. 2015 UT 21, ¶¶ 46–64, 345 P.3d 553. In so doing we noted the imprecision and unworkability of a test that opened the door to tort liability for "every angry or malicious action" by a business competitor. *Id.* ¶ 46. And we emphasized the difficulty that improper purpose liability introduced for those who seek to organize their business activities in a manner aimed at minimizing their exposure under tort law. *Id.* ¶ 51 (noting that because "improper-purpose findings are so dependent on fact-finders' personal sympathies, and so insulated from appellate review," it is "impossible for private parties to understand their rights and duties under tortious interference law"). With these and other concerns in mind we conclusively held in *Eldridge* that "in the absence of any improper means, an improper purpose is not grounds for tortious interference liability" under Utah law. *Id.* ¶ 70.

¶6   We have long followed the presumption that an alteration of the common law in one of our opinions applies retroactively to the parties who seek it. *See Malan v. Lewis*, 693 P.2d 661, 676 (Utah 1984). And that principle leads to a strong corollary—that parties to other cases pending on appeal are also entitled to the benefit of such a change in the law. *See Labrum v. Utah State Bd. of Pardons*, 870 P.2d 902, 914 (Utah 1993). Appellees have not challenged the applicability of this corollary here. We accordingly apply it—proceeding on the premise that the *Eldridge* standard governs even though that decision was not handed down until after trial. And we reverse and remand for a new trial on the tortious interference claim.

¶7   We also reverse and remand on the "false light" invasion of privacy claim. Where such claims are predicated on defamatory speech, the judge plays an important gatekeeping role—assuring that the jury considers only statements that are capable of defamatory meaning and avoiding the risk of a party being punished for speech that is unpopular but not actionable. We conclude that the judge failed to fulfill this role adequately in this

case, and we reverse and remand for a new trial on this claim as well.

I

¶8   Layton is one of the largest construction companies in Utah. Until Peterson was promoted to the office of president in 2000, only members of the Layton family had run the company. In time Peterson began to clash with members of the Layton family. The clash came to a head in late 2002. At that time Peterson had an "emotional, highly charged, and personal" falling out with the leadership of Layton. He left and then formed his own rival construction company, SIRQ.

¶9   Peterson asked some members of the Layton management team to work for SIRQ. And he used forms and documents he acquired while working at Layton.

¶10 In response, in mid-2007 Layton began to ask its management level employees and prospective employees to sign a noncompetition agreement. The agreement forbade Layton employees from working for SIRQ or contracting with SIRQ within two years after leaving Layton. But it had no application to any other construction companies. Employees were free to work for any rival company except SIRQ.

¶11 The noncompetition agreement was presented to all prospective management-level employees. Signing it was a condition of employment. This practice continued from 2007 until the time of trial, almost six years later.

¶12 When Layton presented the noncompetition agreement to prospective employees, it also provided a memorandum asserting its grounds for requiring its workers to sign the document. The memorandum included statements allegedly placing SIRQ and Peterson in a defamatory, false light. Layton accused SIRQ and Peterson of engaging in various unsavory practices, for example, and claimed that these practices, "if permitted to continue, would threaten our very existence."

¶13 Layton also made several other remarks that were critical of SIRQ and Peterson. Layton's president commented, for example, that SIRQ's approach to valuing stock was

"inappropriate" and a "farce," and accused SIRQ investors of having "SIRQ blindness." Other Layton officials criticized SIRQ for "using documents and procedures taken from Layton," and said that SIRQ's stock plan was "not a good plan." And another Layton official told the owner of a local car wash (who had employed SIRQ on a construction job) that SIRQ "wasn't trustworthy," was "dishonest," and "didn't do quality work."

¶14 Layton also undertook other actions that SIRQ challenged as improper. It filed this lawsuit, which SIRQ challenged as malicious and unfounded. It also successfully urged SIRQ's bonding agent to drop SIRQ as a client. And it defaulted on a promissory note to Peterson in an alleged attempt to reduce SIRQ's available capital.

¶15 Layton filed this suit in 2007. It asserted claims for breach of fiduciary duty, breach of contract, misappropriation of trade secrets, unjust enrichment, and intentional interference with contractual relations. SIRQ and Peterson each asserted counterclaims for intentional interference with economic relations, defamation, false light invasion of privacy, and breach of the covenant of good faith and fair dealing. SIRQ's intentional interference claims were predicated on both an allegation of improper means (principally Layton's purportedly defamatory statements) and an assertion of improper purpose (Layton's allegedly malicious motive of destroying SIRQ's and Peterson's reputation and business). SIRQ claimed that it had lost significant revenue due to Layton's actions. It also alleged harm to its reputation and the loss of its bonding agent at a critical stage of development.

¶16 After a period of discovery the parties filed motions for summary judgment. Several of Layton's claims were dismissed on summary judgment. Layton also voluntarily dismissed some of its claims. Only Layton's breach of contract claim against Peterson and its intentional interference claim against both SIRQ and Peterson remained for trial.

¶17 Layton also moved for summary judgment on SIRQ's and Peterson's claims. The district court denied those motions, but it also required SIRQ to identify specific statements it alleged to be

actionable under its false light and defamation theories. SIRQ initially identified twenty-four statements. But Layton successfully argued, both during the summary judgment stage and before the case was submitted to the jury, that several of those statements were not capable of defamatory meaning or lacked evidentiary foundation in the record. So the court seemed to conclude that these statements were not actionable. Yet it made no formal ruling excluding them from trial. It does not appear that the jury was told to ignore these statements or that any other consequences flowed from the determination that several of the statements in question were not actionable.

¶18 The parties' claims proceeded to trial in 2013. Before trial Layton proposed a special verdict form requiring the jury to identify which specific statements, if any, it found actionable under either the defamation or false light claims. SIRQ opposed this form as unnecessary. The district court declined to require the form. So the jury was not asked to identify which statements it deemed defamatory. Nor was it given a list of purportedly defamatory statements to consider. It was left to consider all of the statements presented over the course of a five-week trial.

¶19 The jury returned a verdict in favor of SIRQ and Peterson on the intentional interference, defamation, and false light claims. It awarded SIRQ $7.2 million in compensatory damages and $5 million in punitive damages on the intentional interference claim, but no damages on the other claims. As for Peterson, the jury awarded no damages on the intentional interference and defamation claims, but did award $1 million on the false light claim. The jury ruled against Layton on its claims.

¶20 Layton filed a motion for a judgment notwithstanding the verdict, or in the alternative for a new trial. In its motion, Layton challenged the tortious interference verdict on the ground that improper purpose should not be an independent basis for liability, citing the "grave doubts" about the "vitality" of the improper purpose branch of the intentional interference tort expressed by Justice Zimmerman in *Pratt v. Prodata*, 885 P.2d 786, 789 n.3 (Utah 1994) (Zimmerman, J., majority opinion in part and plurality opinion in part). Layton also challenged the false light verdict. It claimed error in the district court's failure to perform a

"gatekeeper" role regarding statements that SIRQ and Peterson alleged to be defamatory—by precluding the jury's consideration of statements that in Layton's view were not capable of defamatory meaning, or by using a special verdict form asking the jury to identify which statements it deemed defamatory.

¶21 The district court denied Layton's motion and upheld the jury verdict in all respects. It first affirmed the viability of the intentional interference verdict. Citing *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293 (Utah 1982), and the majority opinion in *Pratt*, 885 P.2d at 790, the district court concluded that an intentional interference verdict could stand on proof of improper purpose without any proof of improper means. As to the false light claim, the court acknowledged that several nondefamatory statements had been erroneously submitted to the jury. But it upheld the verdict on the ground that the jury still had sufficient evidence to sustain its false light verdict, noting that the Layton memorandum included some statements that were capable of defamatory meaning.

¶22 Layton filed this appeal. It challenges the district court's refusal to grant a new trial on the tortious interference and false light claims, but it does not contest the verdict on its own claims.[1]

¶23 Layton charges threshold legal error in the standards applied by the district court in denying its motion for new trial on the intentional interference and false light claims. Thus, Layton asks us to reverse and remand for a new trial on these claims. We review Layton's allegations of legal error for correctness. And we will order a new trial if we determine that any legal error undermines our confidence in the jury verdict. *See ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 2013 UT 24, ¶ 21, 309 P.3d 201.

---

[1] Layton does not expressly challenge the denial of its motion for judgment notwithstanding the verdict. But it does urge us to reject the false light claim if we find that none of the statements were capable of a defamatory meaning.

## II

¶24 Layton challenges the legal standards applied by the district court in denying the motion for new trial on both the intentional interference and false light claims. The alleged error on the intentional interference claim is based on our recent decision in *Eldridge v. Johndrow*, 2015 UT 21, 345 P.3d 553. In *Eldridge* we repudiated the improper purpose branch of the tort of intentional interference—overruling our prior decisions on that point and holding that this tort now requires proof of some form of improper means by the defendant and cannot stand on proof of improper purpose alone. *Id.* ¶¶ 46–64. Layton claims the right to the benefit of the *Eldridge* standard on this appeal. We agree. The district court's analysis was consistent with our caselaw as it stood at the time of the denial of the motion for new trial; but parties are presumptively entitled to the benefit of changes in the common law while their case is still pending on appeal. *See Labrum v. Utah State Bd. of Pardons*, 870 P.2d 902, 914 (Utah 1993) (noting that "considerations of judicial integrity require us to extend the benefit of our decision to petitioner and any [party] who currently has a claim pending in the district court or on appeal").

¶25 And under *Eldridge* there was legal error in the district court's decision denying the motion for new trial on SIRQ's intentional interference claim. For reasons explained below we reverse the decision denying the motion for new trial on this claim, concluding that the court's legal error undermines our confidence in the jury's verdict and thus entitles Layton to a new trial.

¶26 We also reverse and remand for a new trial on the false light claim. On this claim we again find a threshold legal error. The error here, as explained below, is in the district court's failure to perform the gatekeeping function of assuring that the jury considered only statements by Layton that are capable of defamatory meaning. We conclude that this error undermines our confidence in the jury verdict. And we accordingly reverse and remand for a new trial.

A

¶27 We first recognized the tort of intentional interference with economic relations in *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 302 (Utah 1982). In that case we held that a plaintiff has a right to recover in tort upon a showing "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff." *Id.* at 304. We also expressly stated that an "improper purpose (or motive, intent, or objective) will support a cause of action for intentional interference with prospective economic relations even where the defendant's means were proper." *Id.* at 307.

¶28 In so doing, we acknowledged that "[i]n the rough and tumble of the marketplace, competitors inevitably damage one another in the struggle for personal advantage." *Id.* And we highlighted the need to protect the "inevitable byproduct of competition" from an imposition of liability. *Id.* To do so, we required proof that a competitor's improper purpose predominated over any legitimate motivations. *Id.* Yet we conceded the existence of "[p]roblems inherent in proving motivation or purpose" and cautioned against over-use in this branch of the tort. *Id.*

¶29 Over time the downsides of the improper purpose branch of the tort of intentional interference became ever more apparent. In *Pratt v. Prodata*, 885 P.2d 786 (Utah 1994), Justice Zimmerman expressed "grave doubts about the future vitality of *Leigh's* improper-purpose prong." *Id.* at 789 n.3 (Zimmerman, J., majority opinion in part and plurality opinion in part). He highlighted the unpredictability of the inquiry into purpose and hence the unavailability of any "meaningful appellate review." *Id.* And he accordingly urged the abandonment of this branch of the tort. *Id.*

¶30 This court took up that invitation in *Eldridge v. Johndrow*, 2015 UT 21, 345 P.3d 553. In *Eldridge* we unanimously repudiated the improper purpose branch of the tort of intentional interference and overruled *Leigh Furniture* and *Pratt* on that point. *Id.* ¶ 70. We held that "a person who violates no legal duties, infringes no

one's rights, and commits no wrongful action can never be held liable for malice alone." *Id.* ¶ 69.

¶31 Layton claims the benefit of the *Eldridge* decision on this appeal. And SIRQ concedes the point; it does not refute Layton's right to challenge the district court's denial of its motion for new trial under the law as it stands today (under *Eldridge*). Thus, although *Eldridge* was not the law at the time of the actual decision on the motion in the district court, both parties assess the propriety of the district court's decision under the *Eldridge* standard, not the *Leigh Furniture* standard.

¶32 We proceed on that premise. In so doing we consider whether a "reasonable likelihood exists that the error affected the outcome of the proceedings." *Jones v. Cyprus Plateau Mining Corp.*, 944 P.2d 357, 360 (Utah 1997). We should reverse and remand for a new trial, in other words, if "the likelihood of a different outcome" is "sufficiently high to undermine [our] confidence in the verdict." *State v. Knight*, 734 P.2d 913, 920 (Utah 1987).

¶33 SIRQ urges affirmance under this standard. It cites record evidence that the jury could have relied on in reaching a verdict in its favor *without* relying on evidence of improper purpose. Specifically, SIRQ cites evidence of Layton's alleged improper means—in interfering with SIRQ's relationship with its bonding agent, in making tortious statements, in defaulting on the promissory note, and in filing this litigation. And because SIRQ views that evidence as substantial, it claims that the verdict should be affirmed even assuming error in the failure to anticipate and adopt the *Eldridge* standard in the instructions given to the jury.

¶34 We see the matter differently. SIRQ's allegations and evidence of improper purpose were a central feature of the trial. SIRQ highlighted the theme of Layton's bad motive in opening statements. It emphasized this theme throughout the presentation of its evidence and the rebuttal of Layton's defense. And it hammered the point home in closing arguments, inviting the jury to find against Layton on the tortious interference count on the ground that Layton's "purpose and intent was to stick it to SIRQ

and Mr. Peterson, to inflict harm on SIRQ and Mr. Peterson," and to do so "intentionally. . . and with malice."

¶35 SIRQ's recurring emphasis on Layton's improper purpose undermines our confidence in the jury's verdict. Perhaps it's possible that a jury instructed in accordance with *Eldridge* would still have entered a verdict against Layton. But we conclude that there is at least a "reasonable likelihood" that the failure to apply the *Eldridge* standard "affected the outcome of the proceedings." *Jones*, 944 P.2d at 360. And we reverse and remand for a new trial on that basis.[2]

¶36 As we noted in *Eldridge*, the "outcome" of an intentional interference case "becomes unpredictable as soon as any evidence of improper purpose is introduced." 2015 UT 21, ¶ 51. "[O]nce a plaintiff presents evidence of an improper purpose, no legal standard exists to guide fact-finders' determination of whether that purpose or the defendant's legitimate purposes

---

[2] In so concluding, we acknowledge the general rule that a verdict should stand on appeal if there is substantial evidence to support any one of several alternative theories of liability. *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 468–69 (Utah 1996). Under this principle, an intentional interference verdict that rests on a faulty premise (improper purpose) could still stand if it is nonetheless sustained by a valid premise (improper means).

Yet the above-cited rule is limited. It "is essentially a refined version of the harmless error rule." *Id.* at 467 n.3. So the mere existence of an alternative basis for a verdict does not always lead to an affirmance. The question is one of harmlessness. In a case like this one we cannot affirm if "we conclude that 'the likelihood of a different outcome [absent the error] is sufficiently high as to undermine our confidence in the verdict.'" *Id.* (alteration in original) (citation omitted). And for reasons explained above, we find such a likelihood here. We reverse because we conclude that there is a likelihood that SIRQ's pervasive reliance on improper purpose affected the outcome at trial, and thus that our confidence in the verdict is shaken to a degree that we cannot affirm on the alternative basis (improper means) advanced at trial and urged on appeal.

predominated." *Id.* ¶ 48. Pre-*Eldridge*, "[j]uries [were] required to look into the defendant's soul and discern which of her mixed motives was the real cause of her action." *Id.* This indeterminate inquiry meant that "any significant evidence of improper purpose would allow juries to find even the most commonplace commercial conduct tortious, no matter how much evidence could be presented of legitimate motivations." *Id.* ¶ 50. And that prospect meant that "[t]he outcome of improper-purpose claims would . . . depend more on jurors' personal sympathies for one party or the other than on any generally applied legal rule." *Id.*

¶37 This was a substantial basis for our abandonment of the improper purpose branch of the intentional interference tort in *Eldridge*. And it is also a ground for our decision to reverse and remand for a new trial in this case. We cannot rule out the possibility that the verdict in this case may have been based on sympathy for SIRQ or animosity toward Layton based on the allegations and evidence that Layton had a bad intent toward SIRQ. And that possibility undermines our confidence in the verdict and requires that we remand for a new trial.[3]

B

¶38 Our law has long recognized a right to sue for harm caused by speech that casts a claimant in a highly offensive "false light." *See Jensen v. Sawyers*, 2005 UT 81, ¶ 45, 130 P.3d 325. This right of action has deep roots in English common law. It can be traced back to the time of Lord Byron, who was granted a right to sue to stay the publication of a "spurious and inferior poem" that was falsely attributed to him. *Id.* (quoting William L. Prosser, *Privacy*, 48 CAL. L. REV. 382, 398 (1960)).

¶39 Many false light claims are "predicated on publication of a defamatory statement." *Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896, 907 (Utah 1992). And such claims "reside in the shadow

---

[3] Because we reverse on this point, we do not reach the question whether any of the purportedly improper means identified by SIRQ and Peterson were sufficient to sustain an intentional interference verdict under *Eldridge*.

of the First Amendment." *Jensen*, 2005 UT 81, ¶ 50. For these claims the interest in protecting a claimant's privacy must be "[c]ounterbalanced against . . . the overriding importance to society, as a whole, of maintaining the free flow of public information." *Cox v. Hatch*, 761 P.2d 556, 563 (Utah 1988).

¶40 To strike this balance, the district court must conduct "an initial inquiry" aimed at assuring that only statements capable of defamatory meaning are considered by the jury in entering its verdict. *West v. Thomson Newspapers*, 872 P.2d 999, 1008 (Utah 1994). Courts have generally identified two means by which the district court may perform this gatekeeping function. One approach is to screen statements in advance of trial on a motion for summary judgment or motion *in limine*—identifying specific statements or categories of statements that are capable of defamatory meaning, and directing the jury to consider only those statements in assessing the viability of a false light or defamation claim.[4] Another approach is to give the jury a special verdict form requiring the jury to identify specific statements it finds false or defamatory;[5] such a form facilitates judicial review of a

---

[4] *See, e.g., W. v. Media Gen. Operations, Inc.*, 120 F. App'x 601, 618 (6th Cir. 2005) (remanding for a new trial because the lack of a "definite list of alleged defamatory statements" gave the jury "a carte blanche invitation to pick" from a wide range of nondefamatory remarks).

[5] *See, e.g., Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 136 (1st Cir. 1997) (using only a general verdict form "poisons the general verdict" when a non-defamatory statement is erroneously submitted to the jury); *Avins v. White*, 627 F.2d 637, 646 (3d Cir. 1980) (reversing a jury verdict because "[n]o special interrogatories or verdict form" were used and "it is therefore impossible to determine" which statements the jury based its verdict on); *Pharmacists Mut. Ins. Co. v. Myer*, 993 A.2d 413, 417 (Vt. 2010) (noting that "the jury was directed to consider *separately* the two categories of statements, to apply *separate* standards of liability to each, and to return *separate* verdicts on each" (emphasis in original)).

defamation or false light verdict—allowing the trial judge or an appellate court to consider whether the verdict is in fact based on a statement capable of defamatory meaning.

¶41 Neither approach was followed in this case despite Layton's efforts to require the jury to state on a statement-by-statement basis which remarks it found to be defamatory. *See infra* ¶¶ 49–53. The district court performed no pretrial narrowing of the pool of statements in order to limit the jury's consideration to only specific statements or categories of statements capable of defamatory meaning. And there was no special verdict form allowing the jury to identify the statements it relied on.

¶42 We reverse and remand for a new trial on that basis. The jury in this case was allowed to consider a wide range of garden-variety comments made by one business competitor about another. Many such statements were sharp and even acerbic, but not ultimately capable of defamatory meaning. And for that reason we are left with a lack of confidence in the jury's verdict.

¶43 We accordingly reverse and remand for a new trial. In so doing we reject SIRQ's arguments (1) that Layton failed to preserve its position on this issue, and (2) that the existence of at least some potentially defamatory statements is sufficient to sustain the verdict.

1

¶44 SIRQ claims that Layton failed to preserve its challenge to the submission of nondefamatory statements on SIRQ's false light claim. It notes that Layton made no objection when these statements came into evidence at trial. And it contends that such an objection was essential to preserving the right to challenge the admission of such statements on appeal.

¶45 An objection, to be sure, is the prototypical means of preserving a challenge to the admissibility of evidence at trial. And ordinarily we would require an objection as a precursor to an appellate challenge to the admissibility of evidence. But here we conclude that Layton did all that was necessary to preserve its position on appeal.

¶46 Layton asked the district court to fulfill both of the gatekeeping functions we identified above. It filed a motion for

summary judgment seeking to bar SIRQ's reliance on nondefamatory statements at trial. And it requested a special verdict form that would have required the jury to identify the statements it found to be defamatory (and supportive of the false light claim). SIRQ opposed both requests, and the district court sided with SIRQ.

¶47 Layton asked the district court to follow the course we outline above—to limit the statements submitted to the jury to those deemed capable of defamatory meaning and to submit a special verdict form requiring the jury to identify specific statements it relied on in entering its verdict. In so doing it preserved the very claim it asserts on appeal.

¶48 Our preservation rules are premised on principles of fairness. They allow an appellant to advance a position on appeal only if that position was presented in a manner allowing the district court to avoid the error complained of on appeal. *See Weiser v. Union Pac. R.R. Co.*, 2010 UT 4, ¶ 14, 247 P.3d 357. Layton did that here: It asked the district court to do the very things we think the court should have done in fulfillment of its gatekeeper role.

2

¶49 The district court conceded error in allowing some nondefamatory statements to go to the jury. It noted, for example, that the jury heard evidence of statements regarding SIRQ's stock and business plan, which could not have been understood as defamatory. And it also acknowledged the "possibility . . . that the jury's finding of defamation [was] erroneously based on statements for which there can be no liability." For that reason the district court conceded that a new trial might be warranted on the defamation claim. As to the false light claim, however, the court concluded that the First Amendment "limitations and privileges" applicable to defamation claims would not extend to a false light claim.

¶50 We disagree. There are "substantial areas of overlap" between these two torts. *Jensen v. Sawyers*, 2005 UT 81, ¶ 48, 130 P.3d 325. The differences between them are mostly "at their margins." *Id*. ¶ 49. "[V]irtually any defamation claim may be

recast as an action for false light invasion of privacy." *Id.* ¶ 54. For that reason false light claims that arise from defamatory speech raise the same First Amendment concerns as are implicated by defamation claims. And here all of SIRQ's false light claims arise out of the same defamatory remarks that its defamation claims were based on.[6]

¶51 SIRQ nonetheless defends the jury verdict. It does so based on the general verdict rule, under which we "exercise[] every reasonable presumption in favor of the validity" of a jury verdict and affirm if there is even one valid basis upon which the jury could have reached its conclusion. *See Barson ex rel. Barson v. E.R. Squibb & Sons, Inc.*, 682 P.2d 832, 835 (Utah 1984). And because there was at least one statement capable of defamatory meaning that was submitted to the jury, SIRQ seeks affirmance of the false light verdict under this rule.

¶52 We reject this argument in light of the First Amendment dimensions of the district court's failure to fulfill its gatekeeping role. When nondefamatory statements are submitted for the jury's consideration, we may affirm only if we are confident that the jury would have reached the same outcome without considering the erroneously submitted remarks. *See Jones v. Cyprus Plateau Mining*

---

[6] Our cases have also recognized a distinct branch of false light liability for speech that is technically true but places someone in a highly offensive and misleading light. *Jensen v. Sawyers,* 2005 UT 81, ¶ 49, 130 P.3d 323. But SIRQ has not advanced such a claim here. It has not asserted that any of the Layton statements at issue were true but misleading. So SIRQ's false light claims overlap completely with its defamation claims. For that reason we look to defamation cases in identifying the First Amendment overlay of relevance to this case. In so doing, we do not imply that the First Amendment has no impact in a false light case based on true (but highly offensive and misleading) statements. If anything, the First Amendment overlay may be stronger in such cases. *See United States v. Alvarez,* 132 S. Ct. 2537, 2545 (2012) (discussing cases that suggest that in certain contexts false speech is accorded less protection under the First Amendment).

*Corp.*, 944 P.2d 357, 360 (Utah 1997); *see also supra* ¶¶ 22, 37. In this case we lack such confidence and reverse and remand for a new trial on that basis.

¶53  Like the trial judge, we agree that some statements in the memorandum accompanying the noncompete agreement were at least arguably capable of defamatory meaning.[7] Yet the jury was also exposed to numerous other statements that could not have been viewed as defamatory. And, as noted above, the district court neither limited the jury's consideration to only specific statements it found potentially defamatory, nor asked the jury to identify the defamatory statements it relied on in entering its verdict. So on this record we are unable to make an independent assessment of the likelihood of the jury reaching the same verdict in the absence of the district court's gatekeeping error. Because so many nondefamatory statements were admitted, and because on this record we cannot reliably assess which statements formed the basis of the verdict, we find no basis for confidence in the jury's verdict.

¶54 Our confidence is further shaken by SIRQ's above-noted trial strategy—of highlighting Layton's hostility toward SIRQ and Peterson, and emphasizing the heated rhetoric directed at them by Layton. That strategy exacerbates the difficulty of assessing the basis for the false light verdict on appeal. Layton's rhetoric may have been "vehement, caustic, and sometimes unpleasantly sharp." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). But if it was not potentially defamatory it cannot form the proper basis of a false light claim. And on this record we are unable to

---

[7] Examples include statements by Layton that SIRQ "wasn't trustworthy," was "dishonest," and "didn't do quality work," and Layton's accusation that SIRQ "engag[ed] in a pattern of behavior" that "if permitted to continue, would threaten [Layton's] very existence." The latter statement could be understood as opinion or hyperbole; but it also could potentially be viewed as defamatory when read in the context of industry practice and standards of behavior.

exclude the likelihood that such rhetoric may have tainted the jury's decision.

¶55   Absent specific jury instructions or a special verdict form, it is possible that scores of nondefamatory remarks were improperly considered by the jury. In light of this pervasive error, we cannot confidently conclude that the jury did not base its verdict on nonactionable speech. And we remand for a new trial on that basis.

### III

¶56 The trial in this matter highlighted the perils of the improper purpose branch of the tort of intentional interference with contractual relations. Because we have now repudiated that branch of the tort, and because appellees have not challenged Layton's entitlement to the benefit of our recent decision in *Eldridge v. Johndrow*, we reverse and remand for a new trial under the law set forth in that decision. We also reverse the false light verdict because the trial court failed to exercise its gatekeeping function to prevent the jury from considering remarks that were not capable of putting SIRQ and Peterson in a false light.

----