IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 30279-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOEL RODRIGUEZ RAMOS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — At issue is whether Joel Rodriguez Ramos, sentenced 20 years

ago, at age 14, to consecutive 20-year terms for 4 counts of first degree murder, was

entitled to consideration of an exceptional downward sentence when his case was

remanded to correct an error in the terms of his community custody. The answer is that

the trial court had the authority to consider his request. Yet it expressed strong

reservations about its authority in this complex case, in the face of State arguments that

consideration of a reduced sentence would be improper.

The result is ambiguity and an inadequate record from which to determine whether

and why the court exercised its discretion. We reverse the sentence and remand so that

the trial court, with the benefit of this decision on the several challenges raised by the

State, can freely exercise its discretion and provide an adequate record.

## FACTS AND PROCEDURAL BACKGROUND

In 1993, 14-year-old Joel Ramos was charged in juvenile court with four counts of aggravated first degree murder for the deaths of the four members of the Skelton family: a mother, a father, and their 12- and 6-year-old sons. The facts established in the criminal trial of Mr. Ramos's codefendant can be found in the unpublished decision filed in the codefendant's appeal. *State v. Gaitan*, noted at 80 Wn. App. 1077, 1996 WL 123155.

Mr. Ramos was originally charged in juvenile court. After pretrial investigation, he waived his right to a decline hearing and the case was transferred to the adult court division of the superior court. There, he was charged with one count of premeditated first degree murder and three counts of first degree felony murder. He pleaded guilty as charged.

At the time of sentencing, the State, "pursuant to [the parties'] plea agreement," recommended "that Mr. Ramos be sentenced at the low end of the standard range, which is 80 years in prison." Report of Proceedings (Aug. 23, 1993), *State v. Ramos*, No. 25740-1-III, at 26 (Wash. Ct. App.). When it was Mr. Ramos's turn to respond, defense counsel stated, "we would urge the court to follow the recommendation of the prosecutor, that recommendation being one that has been accepted by Mr. Ramos." *Id.* at 27. The defense presented a packet of information regarding Mr. Ramos's childhood and family situation that it asked to be considered, presumably in support of leniency.

In announcing its sentencing decision, the court made several observations relevant to this appeal. Stating that it had considered the fact that Mr. Ramos was only 14, it said, "I know now about your family and where you have come from, about your mother, your brothers, and what has happened in your life. . . . I do appreciate and understand the statements that you have made as to what you did and what you did not do and what you accepted responsibility for and what you did not accept responsibility for in terms of being the primary actor." *Id.* at 32. It stated that the premeditated murder count deserved more than 240 months, but nonetheless sentenced Mr. Ramos to 240 months for that count as well as the others.

Significant here, in the course of accepting Mr. Ramos's plea, the trial court asked him if he understood the standard range on each murder count and that "each count is required by law to be served consecutively, that is, one after another?" to which Mr. Ramos answered, "Yes." *Id.* at 19. At Mr. Ramos's sentencing, which occurred immediately following acceptance of the plea, the court again observed that the sentences for the counts "are required by law to run consecutive, one after another" and imposed consecutive sentences, for a total of 80 years' incarceration. *Id.* at 34.

The deadline for appeal passed with no appeal by Mr. Ramos.

HISTORY OF PRESENT APPEAL

Thirteen years later, in December 2006, Mr. Ramos filed, pro se, a notice of appeal. In the three rounds through this court and the Washington Supreme Court that his

3

appeal has since traveled, it has been determined (1) that his appeal was entitled to proceed "as a timely filed notice of appeal," *Ramos* I;[1] (2) that the terms of his community custody imposed in 1993 were insufficiently precise and must be remanded, *Ramos* II;[2] and (3) most recently, that he was entitled upon the remand to be resentenced rather than limited to the ministerial clarification of the term of community placement that this court had ordered, *Ramos* III.[3]

The resentencing was conducted in September 2011 by a new judge; the judge who had imposed Mr. Ramos's original sentence had retired. Mr. Ramos's paramount concern at the resentencing hearing was that the trial court consider ordering his sentences for the four murders to run concurrently rather than consecutively, thereby reducing his sentence substantially. Before the resentencing hearing, he filed a motion to vacate his sentence as authorized by CrR 7.8(b), presenting it as an alternative basis supporting review and reduction of the sentence.

The trial court denied the request to consider an exceptional downward sentence—what Mr. Ramos refers to as his request for a "full resentencing." In its oral ruling, the

---

[1] Order, *State v. Ramos*, No. 80365-0 (Wash. Mar. 7, 2008) (*Ramos* I).

[2] *State v. Ramos*, 168 Wn.2d 1025, 230 P.3d 576 (2010) (*Ramos* II) (remanding to this court with directions to reconsider whether Mr. Ramos's sentence was deficient in light of *State v. Broadaway*, 133 Wn.2d 118, 942 P.2d 363 (1997)); *State v. Ramos*, noted at 156 Wn. App. 1041, 2010 WL 2487831, at *2 (determining that the sentence was deficient).

[3] *State v. Ramos*, 171 Wn.2d 46, 49, 246 P.3d 811 (2011) (*Ramos* III).

4

court expressed reservations about its authority, all based on objections raised by the State. First, it concluded that its role on remand was to determine the terms and conditions of Mr. Ramos's community placement, interpreting the Supreme Court's decision as not contemplating a full resentencing. Second, it expressed its view that a key precedent on which Mr. Ramos relied—*In re Pers. Restraint of Mulholland*, 161 Wn.2d 322, 166 P.3d 677 (2007)—should not be applied "retroactively" to his case. Report of Proceedings (Sept. 16, 2011) (RP) at 35. Third, it pointed out that matters now urged in favor of an exceptional downward sentence should have been raised by Mr. Ramos's original lawyer, whose effectiveness had never been challenged. Fourth, it attached significance to what it construed as Mr. Ramos's agreement to the imposition of consecutive sentences as a term of his plea bargain, which is why, the court concluded, much of the information now offered in support of an exceptional reduced sentence was not presented.

While offering these rationales in explaining its decision, the trial court also stated that, in any event, it was exercising its discretion not to engage in a full resentencing. Apart from having explained the perceived limitations on its authority, however, it did not offer a reason why. After denying the request for a full resentencing and the CrR 7.8(b) motion, it turned to the action clearly required by the Supreme Court: specification of a community custody term and conditions.

Mr. Ramos appeals, arguing that the trial court erred in (1) denying his request for

5

a full resentencing, (2) denying his CrR 7.8 motion, (3) ruling that *Mulholland* could not be applied to him either through a full resentencing or pursuant to CrR 7.8, and (4) ruling that recent decisions of the United States Supreme Court that recognize a requirement for certain leniency in sentencing juveniles could not be relied upon for their scientific underpinnings in conducting the resentencing or deciding the CrR 7.8(b) motion.

## ANALYSIS

During the trial court's hearing on the resentencing request and CrR 7.8(b) motion, defense counsel granted that the postconviction law bearing on the issues presented was "byzantine." RP at 28. Certainly the different analyses required for Mr. Ramos's request for a full resentencing, on the one hand, and relief under CrR 7.8(b), on the other—complicated in each case by the fact that he had been granted an out-of-time appeal in *Ramos* I—presented the trial court, and now us, with a uniquely complex set of issues.

To most clearly explain our decision, we present it in three parts. First, we address whether the trial court's discretion on remand was as broad as argued by Mr. Ramos, reviewing the several challenges made by the State. We conclude that it was.

Second, we address Mr. Ramos's alternative collateral attack—his motion under CrR 7.8(b)—and how the issues it presents differ from the issues presented by the resentencing alone. We conclude that relief under CrR 7.8(b) was properly denied.

Finally, we review the trial court's disposition of the request for a full resentencing and what proves to be the critical issue: whether, in resentencing Mr. Ramos, the trial

6

court exercised its discretion to consider (or not) his request for an exceptional downward sentence with a full understanding of its discretion and on a proper basis. Because there is reason to believe that the court's decision was based on one or more errors of law, we remand.

## I. The Trial Court's Authority on Remand

### A. The Scope of the Supreme Court's Mandate

The State contends that the Supreme Court's directive that the trial court "specify the community placement term and the conditions of community placement" imposes a limit on the trial court's authority that it would exceed by entertaining Mr. Ramos's request to impose an exceptional downward sentence for the murder counts. *Ramos III*, 171 Wn.2d at 49. In announcing its decision on Mr. Ramos's request for a full resentencing and CrR 7.8 motion, the trial court accepted the State's argument, stating:

> It is my conclusion that the Washington State Supreme Court, in saying "resentencing," was discussing it in a—and the order is in a limited fashion related only to the right to be present because it would involve the discretion of the judge here, meaning me, in determining if any or—if any or if some or many conditions of community placement would apply and that does require discretion, particularly if we're talking about criminal related sanctions. *And so my interpretation of the opinion is, is that the court did not remand this for a complete resentencing on all issues.*

RP at 34-35 (emphasis added).

A trial court's discretion to resentence on remand is limited by the scope of the appellate court's mandate. *State v. Kilgore*, 167 Wn.2d 28, 42, 216 P.3d 393 (2009)

7

(*Kilgore* II) (citing *State v. Collicott*, 118 Wn.2d 649, 660, 827 P.2d 263 (1992)).  But the

scope of appellate court mandates is assessed in light of RAP 2.5(c)(1) and the trial

court's discretion on remand, recognized by that rule, to revisit issues that were not the

subject of an earlier appeal.  *Id.* (citing *State v. Barberio*, 121 Wn.2d 48, 51, 846 P.2d

519 (1993)).[4]  In *Kilgore* I,[5] for example, only two of Kilgore's five convictions were

reversed; the remainder were affirmed.  Yet in *Kilgore* II, addressing a challenge to the

trial court's entry of a new judgment and sentence, the Supreme Court recognized that

while it had not remanded for the purpose of resentencing on the affirmed counts, "the

trial court had discretion under RAP 2.5(c)(1) to revisit Kilgore's exceptional sentence on

the remaining five convictions."  *Id.* at 41.  Similarly, in *Barberio*, the case was remanded

after the appellate court reversed the defendant's conviction of only one charge, which the

State elected not to retry.  The Supreme Court nonetheless held that the trial court

enjoyed discretion to entertain a reduction of the defendant's sentence on the affirmed

count, although it chose not to do so.

---

[4] RAP 2.5(c)(1) provides, "If a trial court decision is otherwise properly before the appellate court, the appellate court may at the instance of a party review and determine the propriety of *a decision of the* trial *court even though a similar decision was not disputed in an earlier review of the same case.*"  (Emphasis added.)  The rule recognizes, implicitly, that trial courts enjoy discretion to revisit an issue on remand that was not the subject of the earlier appeal.  *See Kilgore* II, 167 Wn.2d at 38; *Barberio*, 121 Wn.2d at 51.

[5] *State v. Kilgore*, 147 Wn.2d 288, 53 P.3d 974 (2002) (*Kilgore* I).

When Mr. Ramos petitioned for discretionary review of this court's remand for a ministerial clarification of community placement, he squarely presented the Supreme Court with his position that he was entitled to a full resentencing. His petition challenged the position of this court and that of Division One in *State v. Valentine*[6] that when a portion of a sentence was illegal and had to be changed, the appellate court could remand with directions to make a ministerial correction. Pet. for Review, *State v. Ramos*, No. 84891-2, at 4-8 (Wash. Aug. 4, 2010). He contrasted that with the decision of Division Two in *State v. Davenport*, 140 Wn. App. 925, 167 P.3d 1221 (2007), which, according to Mr. Ramos

> ruled that when a defendant is returned for resentencing, the defendant has a right to be present and the court must conduct a full resentencing. In fact, [Division Two] ruled that the resentencing court can even consider issues that were not raised earlier. "At the resentencing hearing, the trial court had the discretion to consider issues Davenport did not raise at his initial sentencing or in his first appeal."

Pet. for Review at 5 (quoting *Davenport*, 140 Wn. App. at 932). Mr. Ramos asked the Supreme Court to accept review of this court's decision in order "to resolve this conflict between *Davenport*, on the one hand, and *Valentine* and *Ramos*, on the other hand." *Id.* at 8.

The Supreme Court granted Mr. Ramos's petition for review and reversed this court "to the extent it ruled that resentencing is not required." *Ramos* III, 171 Wn.2d at

---

[6] *State v. Valentine*, noted at 156 Wn. App. 1043 (2010).

49. It mandated the cause "to the superior court from which the appeal was taken for further proceedings in accordance with the attached true copy of the opinion." Mandate, *State v. Ramos*, No. 84891-2 (Wash. Mar. 8, 2011).

*Kilgore* II and *Barberio* establish that unless a case is remanded for a purely ministerial purpose, the trial court enjoys the authority that Mr. Ramos asked the trial court to exercise here. *Cf. Kilgore* II, 167 Wn.2d at 47 n.21 (Sanders, J., dissenting) (agreeing that a trial court does not exercise independent judgment if its action on remand is "*strictly ministerial*" (citing *Burrell v. United States*, 467 F.3d 160, 166 (2d Cir. 2006))). The Supreme Court's 2011 decision remanding Mr. Ramos's sentence held that "the trial court's duty on remand is not merely ministerial." *Ramos* III, 171 Wn.2d at 49. Reading the Supreme Court's decision against judicial construction of RAP 2.5(c)(1) and in light of the issue presented to the Supreme Court by Mr. Ramos's petition for review, it is clear that the trial court enjoyed discretion to revisit the concurrent or consecutive character of Mr. Ramos's sentences for the murder counts, which had not been the subject of an earlier appeal.

### B. Limitations Based on Asserted Plea Agreement

The State next contends that Mr. Ramos's request for an exceptional downward sentence violated the terms of his 1993 plea agreement. It asked that the trial court compel specific performance of the asserted plea agreement by recognizing it as foreclosing any request for a full resentencing.

A plea bargain is analogous to a contract right and its terms are read as a contract. *State v. Armstrong*, 109 Wn. App. 458, 462, 35 P.3d 397 (2001). After a party breaches a plea agreement, the nonbreaching party may specifically enforce it. *Id.* (citing *State v. Thomas*, 79 Wn. App. 32, 37, 899 P.2d 1312 (1995)). Applying contract principles, specific performance should be available where a nonbreaching party is faced with a threatened breach. *Pardee v. Jolly*, 163 Wn.2d 558, 569, 182 P.3d 967 (2008). If Mr. Ramos's request for a full resentencing violated his plea agreement, then the State's request that the court compel performance would be appropriate. Mr. Ramos denies that he ever promised to forgo requesting an exceptional downward sentence, however.

Whenever the State opts to specifically enforce a plea agreement, its rights "'are necessarily measured by the agreement itself.'" *Armstrong*, 109 Wn. App. at 462 (quoting *Thomas*, 79 Wn. App. at 37-38). The terms of a plea agreement are defined by what was reasonably understood by a defendant when he entered his plea. *State v. Wakefield*, 130 Wn.2d 464, 481, 925 P.2d 183 (1996) (Sanders, J., concurring in part, dissenting in part) (citing *State v. Cosner*, 85 Wn.2d 45, 51-52, 530 P.2d 317 (1975)); *Gunn v. Ignacio*, 263 F.3d 965, 969-70 (9th Cir. 2001). For the remedy of specific performance to be available, the provision of the plea agreement at issue must be unambiguous. *State v. Bisson*, 156 Wn.2d 507, 523, 130 P.3d 820 (2006). Because a plea agreement is a contract, issues concerning its interpretation are questions of law that we review de novo. *Id.* at 517.

11

The statement of defendant on plea of guilty that was signed by Mr. Ramos

included standard provisions, among them a statement of his understanding of the

maximum sentence and standard sentence range for the crimes with which he was

charged. It also included the following provisions concerning the sentence to be

recommended and imposed:

> 6[.]    IN CONSIDERING THE CONSEQUENCES OF MY GUILTY
> PLEA, I UNDERSTAND THAT:
>      . . . .
> (f) The prosecuting attorney agrees with and will make the
> following recommendation to the judge[:] Standard range sentence
> of 80 years, restitution, court costs and fees, and DNA
> [deoxyribonucleic acid] testing[.] Defendant not required to be
> available to the state for investigation or testimony[.]
> (g) The judge does not have to follow anyone's recommendation as
> to sentence[.] The judge must impose a sentence within the standard
> range unless the judge finds substantial and compelling reasons not
> to do so[.] If the judge goes outside the standard range, either I or
> the State can appeal that sentence[.] If the sentence is within the
> standard range, no one can appeal the sentence[.]

Clerk's Papers at 325 (boldface omitted).

The provisions of the statement of defendant do not reflect any unambiguous

agreement by Mr. Ramos to agree with the prosecuting attorney's recommendation or not

to request an exceptional reduced sentence.

As discussed by the dissent, the standard plea form in 1993 included an option

whereby if there were a plea agreement separate from the plea form the parties could

signify as much in section 6(f), deferring to the plea agreement for the prosecutor's

recommendation. That optional provision is omitted from Mr. Ramos's plea form, which makes no reference in section 6(f) or elsewhere to a separate plea agreement. After the State claimed that Mr. Ramos was breaching his earlier agreement, Mr. Ramos's lawyer argued in the trial court that she could find no evidence of such an agreement.[7] She argued in her briefing on appeal that she could find no evidence of such an agreement. Neither in the trial court, nor in its briefing on appeal, nor at the time of oral argument, has the State ever offered or referred to evidence of the terms of a separate plea agreement—it has relied solely on disputed inferences from the statements of the defense lawyers at the original sentencing.

The dissent argues that the proper course, given this record, is to remand for fact finding by the trial court on what Mr. Ramos agreed to do in 1993 in exchange for the recommended sentence. We assume that if the State had evidence from which other

---

[7] She stated:

> The prosecutor also argued that by us just asking you to revisit this sentence and to run several of the sentences concurrently that we're violating the plea agreement. So I went back through the Statement of Defendant on Plea of Guilty, which is attached as an appendix to, I think, both of our documents, and I found the part that says the State is bound to recommend 80 years, which was the low end of the sentencing range. I didn't find the part that said that Mr. Ramos was bound then or now to recommend 80 years as the sentence on (inaudible) of having the plea agreement withdrawn or be forced into specific performance. So if I'm overlooking something in that written plea agreement that he signed, I apologize. But my read of it says he can do exactly what he's doing now and still retain that plea agreement.

RP at 17.

agreements by Mr. Ramos were clearly ascertainable, it would have presented that evidence before now, inasmuch as the issue was first raised by Mr. Ramos in 2011.

The trial court may not specifically enforce any promise the State contends was made by Mr. Ramos if the evidence is at all ambiguous. A defendant's promise, oral or otherwise, "'is not subject to specific performance unless the precise act sought to be compelled is clearly ascertainable.'" *Bisson*, 156 Wn.2d at 524 (quoting *Emrich v. Connell*, 105 Wn.2d 551, 558, 716 P.2d 863 (1986)). A promise susceptible to more than one meaning will not be specifically enforced, especially where the party seeking enforcement is relying not on a written plea agreement but on a disputed, unwritten agreement between a defendant's lawyer and the prosecutor. *State v. Yates*, 161 Wn.2d 714, 739, 168 P.3d 359 (2007).

It is not as though Mr. Ramos's statement on plea does not reveal other consideration for his agreement with the State. By its terms, he explicitly gave up six important constitutional rights. As observed in *Wakefield*, a pleading defendant's agreement to give up his constitutional right to jury trial, to confront witnesses, to confront his accusers, to remain silent, and to be convicted beyond a reasonable doubt, is "'perhaps the most devastating waiver possible under our Constitution.'" 130 Wn.2d at 481 (quoting *Dukes v. Warden, Conn. State Prison*, 406 U.S. 250, 258, 92 S. Ct. 1551, 32 L. Ed. 2d 45 (1972) (Stewart, J., concurring)).

14

The statements made by the lawyers and the court at the original sentencing hearing do not unambiguously demonstrate an agreement by Mr. Ramos not to request a less-than-80-year sentence. The State's claim of an agreement was not a legitimate basis for refusing to consider his request for a full resentencing.

## C. Authority to Apply *Mulholland*

The State next contends that Mr. Ramos was not entitled to invoke the Washington Supreme Court's decision in *Mulholland* as establishing the trial court's authority to order exceptional concurrent sentences. In the trial court, it argued that Mr. Ramos's argument for "retroactive" application of *Mulholland* was foreclosed by "*Teague* [*v. Lane*[8]] and [its] progeny." RP at 21-22. In *Teague*, the United States Supreme Court held that a defendant generally may not rely for habeas corpus relief on a new rule for the conduct of criminal prosecutions. Unless a new rule falls within an exception to the general rule, it will not apply to a case that has become final before it is announced. 489 U.S. at 310.

New cases are those that break new ground or impose a new obligation on the states or the federal government or if the result was not dictated by precedent existing at the time the defendant's conviction became final. *In re Pers. Restraint of Scott*, 173 Wn.2d 911, 918, 271 P.3d 218 (2012) (quoting *State v. Evans*, 154 Wn.2d 438, 444, 114

---

[8] *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989).

P.3d 627 (2005)). The analysis of whether a defendant is entitled to claim the benefit of a new rule announced after conviction is commonly referred to as "retroactivity analysis."

On appeal, the State makes a different argument: it now argues that *Mulholland* did not create a new rule and, for that reason, retroactivity analysis does not apply. In refusing to apply *Mulholland*, however, the trial court accepted the State's original argument that Mr. Ramos could not invoke *Mulholland* retroactively. We address both of the State's arguments, below and on appeal, as to why the trial court could not apply *Mulholland*.

### *Retroactivity analysis under* Teague

At the time Mr. Ramos was originally sentenced, former RCW 9.94A.400(1)(b) (1990) provided that "[w]henever a person is convicted of two or more serious violent offenses . . . arising from separate and distinct criminal conduct," the sentences "shall be served consecutively to each other." The law was clear that offenses arise from "separate and distinct criminal conduct" when they involve separate victims, as they did in Mr. Ramos's case. *State v. Wilson*, 125 Wn.2d 212, 220, 883 P.2d 320 (1994).

At the same time, former RCW 9.94A.390 (1990) authorized a court to depart from the sentencing standards for an offense upon a finding of substantial and compelling reasons justifying an exceptional sentence. No reported case had determined whether the trial court's authority to impose an exceptional sentence included the authority to impose concurrent sentences for multiple serious violent offenses despite former RCW

9.94A.400(1)(b)'s language that such sentences "shall be served consecutively to each other."

In 2007, the Washington Supreme Court addressed the two provisions in *Mulholland*, holding that a trial court's discretion to impose an exceptional sentence includes discretion to impose concurrent sentences where consecutive sentences are presumptively called for; it affirmed the Court of Appeals' decision granting Mulholland's personal restraint petition and remanding for resentencing because the trial court had mistakenly believed it lacked discretion. *Mulholland*, 161 Wn.2d at 326 n.1.

In holding in *Mulholland* that a trial court could depart from presumptive consecutive sentencing, the Supreme Court characterized this as "a question we have not directly addressed." *Id.* at 328, 330. It acknowledged that this court's decision in *State v. Flett*, 98 Wn. App. 799, 806, 992 P.2d 1028 (2000), which stated that first degree assault sentences are "required to be consecutively sentenced," might be read to state otherwise, in dicta. But the *Mulholland* court held that a plain reading of what was formerly codified at RCW 9.94A.390—*recodified as* RCW 9.94A.535—"led[ ] inescapably" to the conclusion that a departure from standard consecutive sentencing (former RCW 9.94A.400, *recodified as* RCW 9.94A.589) was an exceptional sentence that could be imposed subject to the limitations of the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW. 161 Wn.2d at 330. Notably, the particular "plain language" from RCW

17

9.94A.535 on which the court relied had not been added until 2000.[9] *Id.* at 329. In amending the statute to add the language, however, the legislature made clear that it did not intend to make any substantive changes to the statute.[10]

The State now concedes that because *Mulholland* was based on statutes in effect at the time of Mr. Ramos's crimes, it did not constitute a new rule. It agrees that once the court has determined the meaning of a statute, then that is what the statute has meant since its enactment. *In re Pers. Restraint of Vandervlugt*, 120 Wn.2d 427, 436, 842 P.2d 950 (1992). Sentencing courts "look to the statute in effect at the time [the defendant] committed the [current] crimes" when determining a defendant's sentence. *State v.*

---

[9] *Mulholland* states:
[T]he State's argument fails because it pays too little heed to the plain language of RCW 9.94A.535. As we have observed above, it provides that exceptional sentences may be imposed when sentencing takes place under RCW 9.94A.589(1). Because it does not differentiate between subsections (1)(a) and (1)(b), it can be said that a plain reading of the statute leads inescapably to a conclusion that exceptional sentences may be imposed under either subsection of RCW 9.94A.589(1).
161 Wn.2d at 329-30. The language in RCW 9.94A.535 to which the court refers was all added to that provision—former RCW 9.94A.390—by Laws of 2000, ch. 28, § 8.

[10] The addition of the language was a significant textual change, yet the legislative history makes clear that "[t]he legislature does not intend this act to make, and no provision of this act shall be construed as making, a substantive change in the sentencing reform act." LAWS OF 2000, ch. 28, § 1. As pointed out by Mr. Ramos, the "Testimony For" section of the House Bill Report on S.B. 6223 discloses that the prosecuting attorneys' association, among others, reviewed the bill and ensured that it did not make any substantive changes to existing law, describing it as "entirely a technical and non-substantive bill" whose rewrite began several years after the SRA "started becoming more and more difficult to read." H.B. REP. on S.B. 6223, 56th Leg., Reg. Sess. (Wash. 2000).

18

*Delgado*, 148 Wn.2d 723, 726, 63 P.2d 792 (2003). In short, the State concedes that the trial court's expressed basis for concluding that *Mulholland* would not apply was in error.

There was a second reason that concluding *Mulholland* would not apply "retroactively" to Mr. Ramos was in error: new rules apply to cases that are not yet final before the new rule is announced. For purposes of retroactivity analysis, finality is defined as "the point at which 'a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied.'" *Kilgore* II, 167 Wn.2d at 43 (internal quotation marks omitted) (quoting *In re Pers. Restraint of St. Pierre*, 118 Wn.2d 321, 327, 823 P.2d 492 (1992)).

Although Mr. Ramos's judgment and sentence was entered in 1993, a state court may restore the pendency of an otherwise-final judgment of conviction by granting a defendant an out-of-time appeal. *Id.* at 39 n.10 (citing *Jimenez v. Quarterman*, 555 U.S. 113, 129 S. Ct. 681, 172 L. Ed. 2d 475 (2009)). As Mr. Ramos points out, despite the 20 years that have passed since his conviction, the Washington Supreme Court granted him an out-of-time appeal in 2008. By then, *Mulholland* had already been decided. Even if *Mulholland* announced a new rule, it did so before Mr. Ramos's sentence became final.

The trial court mistakenly concluded that *Mulholland* did not "retroactively" apply to Mr. Ramos on the basis of the State's original *Teague* rationale.

*The State's position on appeal*

The position that the State now advances—that if retroactivity analysis does not apply, then Mr. Ramos was not entitled to urge *Mulholland* as a basis for an exceptional downward sentence (*see* Br. of Resp't at 17-18)—is unexplained. If *Mulholland* did not reflect a new rule but only what the statutes meant at the time of Mr. Ramos's crimes, then that is the law the trial court should have applied, had it exercised its discretion to engage in a full resentencing. The State offers no explanation why that would not be so.

As a clarification of former RCW 9.94A.390 and .400(1)(b), *Mulholland* reflects the meaning of those statutes at the time of Mr. Ramos's crimes and therefore the law that should apply in any resentencing.

### D. Collateral Estoppel/Law of the Case

Finally, the State argues that Mr. Ramos should be prohibited from raising a new request for an exceptional sentence "since he has had numerous occasions to do so in the past, and has not [done] so." Br. of Resp't at 13. It argues that "[t]he appellant is not entitled to reargue the length of his sentence and he should not be allowed to by requiring a 'resentencing.'" *Id.* at 11. In announcing its decision not to engage in a full resentencing, the trial court referred to the issues Mr. Ramos was asking it to consider and observed, "it seemed to me that relates to ineffective assistance of counsel, saying that the attorney should have raised that issue at the time of the sentencing." RP at 36. The State supports that trial court reasoning on appeal.

20

Contrary to the State's position and the trial court's assumption, the fact that Mr. Ramos did not request an exceptional sentence until 2011 was no reason for refusing to consider the request at that time. The State appears to have in mind principles of collateral estoppel or law of the case, but neither applies.

In *Collicott*, 118 Wn.2d 649, our Supreme Court reversed the defendant's sentence due to an incorrectly calculated offender score. Both the lead and concurring opinions agreed that on remand the trial court had authority to impose an exceptional sentence despite the fact that it refused a request to impose an exceptional sentence at the time of the original sentencing. There was a qualifier in the four-member lead opinion; that minority of justices stated that the exceptional sentence could be imposed "unless the court is estopped by its prior determination on the same facts in the original sentencing." *Id.* at 658 (italics omitted). The five-member concurring opinion disavowed the lead opinion's discussion of collateral estoppel, which it stated "goes beyond what is necessary to resolve this case." *Id.* at 670 (Durham, J., concurring).

Eleven years later, the Supreme Court distanced itself from *Collicott's* discussion of collateral estoppel and, perhaps more importantly for present purposes, observed that collateral estoppel precludes the same parties only "from relitigating issues *actually raised and resolved* by a former verdict and judgment." *State v. Harrison*, 148 Wn.2d 550, 560-61, 61 P.3d 1104 (2003) (emphasis added).

The law of the case doctrine is similarly inapplicable when a defendant raises a

21

new issue for the first time on remand. "The 'law of the case' doctrine generally 'refers to "the binding effect of determinations made by the *appellate court* on further proceedings in the trial court on remand"' or to '"the principle that an *appellate court* will generally not make a redetermination of the rules of law which it has announced in a prior determination in the same case."'" *Id.* at 562 (emphasis added) (quoting *Lutheran Day Care v. Snohomish County*, 119 Wn.2d 91, 113, 829 P.2d 746 (1992) (quoting 15 LEWIS H. ORLAND & KARL B. TEGLAND, WASHINGTON PRACTICE: TRIAL PRACTICE: CIVIL § 380, at 55 (4th ed. 1986))). The doctrine "applies only to the questions decided. Thus, matters not discussed or otherwise involved in an appellate decision are not barred by the law of the case doctrine from consideration in a subsequent appeal of the same litigation." Philip A. Trautman, *Claim and Issue Preclusion in Civil Litigation in Washington*, 60 WASH. U. L. REV. 805, 811 (1985). Moreover, the doctrine "does not have general application to trial court rulings," an exception being that jury instructions by the trial court that are not challenged become law of the case. *Id.*

The fact that Mr. Ramos was requesting an exceptional reduced sentence for the first time upon resentencing was not a valid basis for refusing to consider the request.

To summarize: on remand, the trial court enjoyed discretion to engage in a full resentencing, in connection with which it could—but was not required—to consider Mr. Ramos's request for an exceptional downward sentence. It was not constrained by any of the limitations on its authority urged by the State. If it engaged in a full resentencing, it

22

was required to apply former RCW 9.94A.390 and .400(1)(b) as construed in

*Mulholland.*

## II. Mr. Ramos's Alternative Collateral Attack

As an additional basis for relief from his original sentence, Mr. Ramos filed a

motion under CrR 7.8(b). The motion presented different issues than did his request for a

full resentencing on remand. The key difference is that in relying on the remand, Mr.

Ramos was already properly before the court. He had no burden of demonstrating any

further right to ask for a full resentencing.

By contrast, to obtain relief under CrR 7.8(b), Mr. Ramos—like other defendants

collaterally attacking a judgment—bore the burden of demonstrating a right to relief

provided by the rule. Making that threshold showing was necessary but, if met, was

sufficient to require that the trial court consider the relief he was requesting. He would

still have to present evidence of mitigating circumstances in support of an exceptional

downward sentence.

CrR 7.8(b) authorizes the superior court to relieve a defendant from a final

judgment if the defendant demonstrates one of five grounds for relief provided by the

rule. In moving for relief from his sentence, Mr. Ramos relied on two: he presented what

he argues is newly discovered evidence under CrR 7.8(b)(2), which, if believed by the

trial court, established factors that could be relied upon for a mitigated sentence. He also

argued that the Washington Supreme Court's intervening decision in *Mulholland*

provided a basis for relief under CrR 7.8(b)(5).

The State questions, in passing, whether the CrR 7.8(b) motion was timely. Br. of Resp't at 13. It fails to argue why it was not. We agree with Mr. Ramos that because he is still pursuing the out-of-time appeal granted him by the Washington Supreme Court, his motion was timely.[11]

The denial of a CrR 7.8(b) motion to vacate a judgment for the purpose of resentencing is appealable as a matter of right under RAP 2.2(a)(10). *State v. Larranaga*, 126 Wn. App. 505, 508, 108 P.3d 833 (2005).

### A. Request for Relief Under CrR 7.8(b)(2)

CrR 7.8(b)(2) provides that "the court may relieve a party from a final judgment . . . for the following reasons: . . . (2) Newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under rule 7.5." The State has not disputed nor have the parties briefed whether subsection (2) is limited to extending the time within which to seek a new trial or may be relied upon for relief from

---

[11] The motion was subject to the time limits provided by RCW 10.73.090. CrR 7.8(b). RCW 10.73.090(1) generally provides that "[n]o . . . motion for collateral attack on a judgment and sentence in a criminal case may be filed more than one year after the judgment becomes final." Finality is defined differently for purposes of RCW 10.73.090(1) than it is for purposes of the retroactivity analysis discussed in section I.C., above. *Kilgore* II, 167 Wn.2d at 36 n.5. For purposes of RCW 10.73.090(1), a judgment is not final until the sentence is final. *In re Pers. Restraint of Skylstad*, 160 Wn.2d 944, 950-54, 162 P.3d 413 (2007). Inasmuch as Mr. Ramos's sentence was not final at the time he was resentenced, the one-year time limit for filing collateral challenges had not begun to run.

24

a sentence. We assume without deciding that Mr. Ramos may rely upon it for relief from his sentence.

The "newly discovered evidence" on which Mr. Ramos relies is current science concerning adolescent brain development.[12] He points to scientific knowledge accepted by the United States Supreme Court in its decisions in *Graham v. Florida*, ___ U.S. ___, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010) and *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) and to findings made by our legislature in 2005, when it gave sentencing courts discretion to treat juveniles convicted of first degree murder more leniently than adults.

He points, for example, to Justice Kennedy's opinion for the majority in *Graham*,

---

[12] The State successfully argued below that much of Mr. Ramos's proposed evidence dealt with his good behavior following conviction, which, being personal and unique to himself, is not a mitigating matter under the SRA. *State v. Law*, 154 Wn.2d 85, 94-95, 110 P.3d 717 (2005). We agree. Except to the extent that he relies on evidence of his postconviction maturity as making it more likely that mental and emotional immaturity might account for his youthful crimes, the evidence of his good behavior is the sort of evidence that *Law* holds does not support an exceptional downward sentence. His postconviction maturity is relevant for the limited purpose of the trial court's decision whether to consider brain science; had he failed to change his ways in prison, the State would surely cite his continuing bad behavior as evidence that brain immaturity was an unlikely explanation for his youthful crimes. *Cf. People v. Holmes*, 36 Misc. 3d 1205(A), 954 N.Y.S.2d 761, 2012 WL 2535973, at *2 n.7 (unpublished) (noting that the defendant's motion for postconviction relief based on new adolescent brain science "is not helped by his subsequent conduct in state prison") (in New York, case law suggests unpublished opinions are entitled to respectful consideration, although they are not binding precedent. *Eaton v. Chahal*, 146 Misc. 2d 977, 983, 553 N.Y.S.2d 642 (1990); *see* GR 14.1(a); *Condon v. Condon*, No. 86130-7, slip op. at 15 (Wash. Mar. 21, 2013)).

25

which reviewed scientific understanding relied upon in *Roper* on which the high court majority's view had not changed:

> [D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence. Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of "irretrievably depraved character" than are the actions of adults. *Roper*, 543 U.S. at 570, 125 S. Ct. 1183. It remains true that "[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed."
> *Ibid.*

130 S. Ct. at 2026-27 (second alteration in original) (citations omitted).

He also points to a 2005 legislative finding explaining the legislature's choice to eliminate mandatory minimum sentences for first degree murder committed by juveniles tried as adults:

> The legislature finds that emerging research on brain development indicates that adolescent brains, and thus adolescent intellectual and emotional capabilities, differ significantly from those of mature adults. It is appropriate to take these differences into consideration when sentencing juveniles tried as adults. The legislature further finds that applying mandatory minimum sentences for juveniles tried as adults prevents trial court judges from taking these differences into consideration in appropriate circumstances.

LAWS OF 2005, ch. 437, § 1.

Neither *Roper* nor *Graham* apply to Mr. Ramos's case by their terms. *Roper* held that imposing the death penalty on juvenile offenders is unconstitutional, while *Graham* held that it is unconstitutional to sentence a juvenile offender to life in prison without the

possibility of parole for nonhomicide crimes. *Graham* explicitly did not find any

constitutional limit on sentences imposed on juvenile offenders for homicides. 130 S. Ct.

at 2030.

The 2005 legislative amendment likewise does not apply to Mr. Ramos by its

terms. The amendment to RCW 9.94A.540 giving sentencing courts the discretion to

sentence juveniles to less than the otherwise mandatory minimum for first degree murder

explicitly applies only prospectively, to crimes committed on or after the July 24, 2005

effective date of the amendatory act. RCW 9.94A.540(3)(b).

Mr. Ramos argues that he relies on *Roper*, *Graham*, and the legislative findings

supporting the 2005 amendment of juvenile sentencing provisions not for their direct

application to his case but for the principles of brain science they accept, which he argues

qualify as newly discovered evidence.[13]

Mr. Ramos's position that advances in science can qualify as new evidence for

---

[13] He hesitantly suggests that we might construe the legislature's 2005 brain science-based amendment to apply to his resentencing, while at the same time conceding that the amendment "applies only to crimes committed on or after July 24, 2005." RCW 9.94A.540(3)(b). He argues, unpersuasively, that it is "unclear" whether this statute applied at Mr. Ramos's 2011 sentencing. Br. of Appellant at 41.

Absent language indicating a contrary intent, amendments to penal statutes must be applied prospectively under RCW 10.01.040. *In re Pers. Restraint of Hegney*, 138 Wn. App. 511, 542, 158 P.3d 1193 (2007). As pointed out in *Hegney*, not only did the legislature not express an intent that the 2005 amendments to RCW 9.94A.540 apply retroactively, "[it] expressed the opposite intent by explicitly providing that the 2005 amendments . . . apply on or after the effective date of the act: July 24, 2005." *Id.* (citing LAWS OF 2005, ch. 437, § 2.

purposes of relief from a judgment finds support in cases from other jurisdictions. *See,*

*e.g., State v. Avery*, 345 Wis. 2d 407, 826 N.W.2d 60 (2013) (new digital

photogrammetry technology able to enhance videotape of robbery qualified as newly

discovered evidence, although court found that defendant did not demonstrate reasonable

probability it would change result); *Ex Parte Henderson*, 384 S.W.3d 833 (Tex. Crim.

App. 2012) (new developments in science of biomechanics casting doubt on trial

evidence that infant died of "shaken baby syndrome" required new trial); *Bunch v. State*,

964 N.E.2d 274 (Ind. Ct. App. 2012) (advances in field of fire victim toxicology analysis

constituted newly discovered evidence warranting new trial).

Still, not all new evidence entitles a defendant to collaterally attack his judgment

and sentence. CrR 7.8(b)(2) has been construed to require the moving party to

demonstrate that the evidence asserted to be newly discovered (1) will probably change

the result of the trial, (2) was discovered since the trial, (3) could not have been

discovered before the trial by the exercise of due diligence, (4) is material, and (5) is not

merely cumulative or impeaching. *State v. Williams*, 96 Wn.2d 215, 223, 634 P.2d 868

(1981); *State v. Macon*, 128 Wn.2d 784, 800, 911 P.2d 1004 (1996). With respect to the

first showing—that the evidence will probably change the result of the trial—our

Supreme Court has held that a showing that evidence "*may* lead to a different result

[falls] far below the minimal requirement that the claimed evidence *will*, in the court's

considered judgment, probably change the result." *State v. Peele*, 67 Wn.2d 724, 731,

28

409 P.2d 663 (1966).

The fixing of legal punishments for criminal offenses is a legislative function. *State v. Ammons*, 105 Wn.2d 175, 180, 713 P.2d 719, 718 P.2d 796 (1986). A court must generally impose a sentence within the standard sentence range established by the SRA for the offense. *State v. Ha'mim*, 132 Wn.2d 834, 839, 940 P.2d 633 (1997) (citing former RCW 9.94A.120(1) (1993)). The legislature has authorized trial courts to impose an exceptional sentence if they find "substantial and compelling" reasons to go outside the standard range. RCW 9.94A.535. A nonexclusive list of mitigating factors is recognized by statute. RCW 9.94A.535(1).

In *Ha'mim*, the Supreme Court was called upon to decide whether the defendant's age at the time of the crime—in that case, 18—was properly relied upon as a mitigating factor justifying an exceptional downward sentence. In holding that the trial court erred in relying on the defendant's youth, the Supreme Court made clear that the age of a young adult "is not *alone*" a mitigating factor. 132 Wn.2d at 847 (emphasis added). In reaching that conclusion, it acknowledged that a defendant's youth could be relevant to one of the illustrative mitigating factors identified by the legislature, that being that "the defendant's capacity to appreciate the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law was significantly impaired." *Id.* at 846 (citing former RCW 9.94A.390(1)(e), *recodified as* RCW 9.94A.535(1)(e)).

Eight years after *Ha'mim*, and following *Roper*, our legislature found that

29

"adolescent brains, and thus adolescent intellectual and emotional capabilities, differ significantly from those of mature adults. It is appropriate to take these differences into consideration when sentencing juveniles tried as adults," and amended RCW 9.94A.540 prospectively. The Supreme Court anticipated in *Ha'mim* that if evidence demonstrated that culpability was diminished because of youth, it would be a factor that may be considered in sentencing. The legislature's finding and United States Supreme Court recognition support the viability of the brain science offered by Mr. Ramos. It is relevant to a request for an exceptional downward sentence.

For purposes of collateral attack, though, relevance is not enough. The brain science offered must be sufficiently compelling to support vacating a sentence. In this connection, it is important that while the SRA has been modified to allow sentencing courts to be more lenient to juvenile offenders by eliminating mandatory minimum sentences, the amendments have been modest. The SRA does not require courts to be more lenient to juveniles or even encourage it.

Where the legislature has considered the adolescent brain science relied upon by Mr. Ramos and responded by treating mental and emotional immaturity as something that may lead to a different sentence, but not as something that will probably lead to a different sentence, we find that legislative judgment to be persuasive. We note, too, that a divided United States Supreme Court has placed only two narrow limitations on the sentencing of juveniles in light of current brain science. We may affirm the trial court's

30

rejection of Mr. Ramos's motion under CrR 7.8(b)(2) on any grounds supported by the record. *State v. Costich*, 152 Wn.2d 463, 477, 98 P.3d 795 (2004). Because Mr. Ramos did not demonstrate a probability that the new evidence would change the sentencing result, the trial court properly denied his motion for relief under CrR 7.8(b)(2).

B. Request for Relief Under CrR 7.8(b)(5)

Subsection (5) is the final subsection of CrR 7.8(b) and provides for relief for "[a]ny other reason justifying relief from the operation of the judgment." It applies only in extraordinary circumstances not addressed by any of the four preceding subsections of the rule. *State v. Dennis*, 67 Wn. App. 863, 865, 840 P.2d 909 (1992). "'Extraordinary circumstances' must relate to 'irregularities which are extraneous to the action of the court or go to the question of the regularity of its proceedings.'" *State v. Aguirre*, 73 Wn. App. 682, 688, 871 P.2d 616 (1994) (internal quotation marks omitted) (quoting *Shum v. Dep't of Labor & Indus.*, 63 Wn. App. 405, 408, 819 P.2d 399 (1991)); *see State v. Smith*, 159 Wn. App. 694, 700-02, 247 P.3d 775 (2011) (sentencing court had the authority to revisit the defendant's sentence because the county lost the funds for partial confinement, thus constituting an extraordinary circumstance because it was an irregularity extraneous to the court's action). The judgment should only be vacated in the limited circumstances "where the interests of justice most urgently require." *State v. Shove*, 113 Wn.2d 83, 88, 776 P.2d 132 (1989).

Mr. Ramos cites *In re Personal Restraint of Johnson*, 131 Wn.2d 558, 568, 933

P.2d 1019 (1997) as authority for the proposition that a new interpretation of a statute is an extraordinary circumstance justifying relief under the rule. *Johnson* did not involve the standards for relief under CrR 7.8(b)(5), however.

The defendant in *Johnson* filed a personal restraint petition (PRP) after the Washington Supreme Court overruled prior law and redefined the proper way to calculate an offender score. Under the corrected construction of the SRA, it was clear that Johnson's offender score at the time he was sentenced should have been 1, rather than the score of 2 applied by the trial court. He successfully argued that his restraint was unlawful because his sentence was based on the incorrect score, rendering his restraint unlawful and a fundamental defect resulting in a miscarriage of justice. *Id.* at 568-69.

Because this was Johnson's second PRP challenging his offender score, the court relied on the intervening change in the law as satisfying the "good cause" for filing an otherwise successive PRP on the same issue under RAP 16.4(d) and RCW 10.73.140. *Id.* at 567, 569. "Good cause" for failing to raise an issue in an earlier PRP includes a material change in the law. *Id.* at 565.

*Johnson* involved an entirely different context than that presented here. Mr. Ramos has not directed us to any decision holding that a change in the law—here, a new construction of a statute—is a basis for relief under CrR 7.8(b)(5). Construction of a statute is a regular occurrence, not an extraordinary circumstance that relates to an irregularity extraneous to the court's action or questions the regularity of the proceedings.

32

Moreover, to hold that any defendant who is not time barred from seeking collateral relief can obtain relief from a judgment under CrR 7.8(b)(5) for a change in law would vastly enlarge the availability of collateral relief. It would be at odds with well-settled law limiting the retroactive application of new rules.

The trial court properly denied Mr. Ramos's motion for relief under CrR 7.8(b)(5).

### III. Review of Denial of a Full Resentencing

We finally turn to whether the trial court erred or abused its discretion in declining to engage in a full resentencing.

If the court imposes a standard range sentence, the general rule is that it cannot be appealed. *State v. Friederich-Tibbets*, 123 Wn.2d 250, 252, 866 P.2d 1257 (1994). A standard range sentence can be challenged on the basis that the court refused to exercise discretion or relied on an improper basis for declining to consider the request. *State v. Garcia-Martinez*, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997). In such circumstance, it is the court's refusal to exercise discretion that is appealable rather than the sentence itself. *Id.* "Conversely, a trial court that has considered the facts and has concluded that there is no basis for an exceptional sentence has exercised its discretion, and the defendant may not appeal that ruling." *Id.*

When a trial court has the authority to conduct a full resentencing on remand, its refusal to exercise that authority is reviewed for abuse of discretion. *Kilgore* II, 167 Wn.2d at 41 ("[*U*]*nless the trial court erred or abused its discretion in declining to*

33

*resentence Kilgore on remand and simply correcting the original judgment and sentence,* no appealable issues remained" (emphasis added)).

The State argues that the trial court did exercise its discretion, it just did not exercise it in favor of Mr. Ramos. It points to the trial court's statement, after hearing arguments from counsel, that "I've invoked my discretion here to not grant the motion under both of those," with "both of those" apparently referring to Mr. Ramos's request for resentencing and CrR 7.8(b) motion. RP at 41-42. After outlining the perceived limits on the scope of the remand for resentencing, the trial court continued:

> I—my ruling is that the motion with regard to my discretion to reopen this for sentencing is denied. I'm exercising my discretion in doing that. And so it's my decision here today that what needs to be done is to set the term of community placement and to set the conditions of community placement.

RP at 39. Before announcing that it was exercising discretion, however, every reason offered by the trial court for declining to engage in a full resentencing was based on the State's erroneous arguments. The court never offered a reason for refusing to exercise its discretion that we can uphold on appeal.

Mr. Ramos offered colorable grounds for imposing a different sentence. It is now clear from *Mulholland* that Mr. Ramos can be sentenced to exceptional concurrent sentences. Yet he has presented evidence that the original sentencing judge thought otherwise; for that matter, until the 2005 clarification of the applicable statutes even this court said otherwise, in dicta. Significant textual changes (but nonsubstantive changes)

34

were made to the pertinent statutes before the ability to impose exceptional concurrent sentences was held in *Mulholland* to be clear.

The legislature has been persuaded that, prospectively, adolescent brain science supports eliminating mandatory minimum sentencing for first degree murders committed by juveniles. While Mr. Ramos cannot claim the benefit of the prospective change to RCW 9.94A.540, he can at least ask that the court consider his request for an exceptional sentence based on the underlying science that developed pending finality of his sentence—something anticipated in *Ha'mim*.

We do not mean to express a view on how the trial court should exercise its discretion. Mr. Ramos committed a heinous crime. The appropriate sentence is the trial court's domain. We only point out that Mr. Ramos has presented real reasons why a court might choose to reduce his sentence. He should have the opportunity to have his request considered with the correct law in mind.

The trial court recognized as much. After announcing its decision, it cautioned Mr. Ramos that "there's some extremely important issues in this case" and that if he intended to appeal it was important to file his notice timely because otherwise, "you've lost that right forever." RP at 46.

The Supreme Court's decision in *Mulholland* is instructive:

> Here, the trial court sentenced Mulholland while possessed of a mistaken belief that it did not have the discretion to impose a mitigated exceptional sentence for which he may have been eligible. . . .

The record does not show that it was a certainty that the trial court would have imposed a mitigated exceptional sentence if it had been aware that such a sentence was an option. Nonetheless, the trial court's remarks indicate that it was a possibility. In our view, this is sufficient to conclude that a different sentence might have been imposed had the trial court applied the law correctly. Where the appellate court "cannot say that the sentencing court would have imposed the same sentence had it known an exceptional sentence was an option," remand is proper. *State v. McGill*, 112 Wn. App. 95, 100-01, 47 P.3d 173 (2002). As we said in *Grayson*, "[w]hile no defendant is entitled to an exceptional sentence . . . , every defendant is entitled to ask the trial court to consider such a sentence and to have the alternative actually considered." [*State v.*] *Grayson*, 154 Wn.2d [333,] 342[, 111 P.3d 1183 (2005)] (citing *Garcia-Martinez*, 88 Wn. App. at 330).

161 Wn.2d at 333-34 (some alterations in original) (footnote omitted).

We reverse the trial court's "Order Amending Judgment and Sentence" and remand for further proceedings consistent with this opinion.

A majority of the panel has determined that this opinion will not be printed in the Washington Appellate Reports but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

I CONCUR:

_____
Kulik, J.

36

No. 30279-2-III

KORSMO, C.J. (concurring) — The majority misconstrues the nature of the argument concerning the defendant's obligations at resentencing. The prosecutor argued to this court that the defendant breached his plea agreement and we should grant specific performance of the plea agreement. That argument is directed to the wrong court, but the majority's rejoinder is also off base. The matter must be remanded for the reasons stated in the rest of the majority opinion, but the question of whether Joel Rodriguez Ramos would breach the plea agreement by seeking an exceptional sentence must first be answered by the trial court, rather than by this court, if Mr. Ramos seeks an exceptional sentence on remand.

The basic flaw in the majority's analysis is to equate the defendant's statement on plea of guilty (plea statement) with a plea agreement (agreement). They are not the same. *State v. Armstrong*, 109 Wn. App. 458, 467, 35 P.3d 397 (2001) (Quinn-Brintnall, J., dissenting). Indeed, the standard plea statement form, immediately after the space for the prosecutor's recommendation, recognizes that it is not a plea agreement and gives a check-box second option for the prosecutor's recommendation:

[ ] The prosecutor will recommend as stated in the *plea agreement, which is incorporated by reference.*

CrR 4.2(g)(6)(g) (emphasis added).[1]

The majority opinion expressly quotes from *Armstrong* that the prosecutor, in seeking to enforce a plea agreement, necessarily must enforce rights that ""are . . . measured by the agreement itself."" Majority at 11 (quoting *Armstrong*, 109 Wn. App. at 462 (quoting *State v. Thomas*, 79 Wn. App. 32, 899 P.2d 1312 (1995))). In both *Armstrong* and in *Thomas*, there was a separate plea agreement containing numerous terms detailing the defendant's obligations under the agreement. *Armstrong*, 109 Wn. App. at 468-69 & n.9 (Quinn-Brintnall, J., dissenting) (citing to both plea form and plea agreement); *Thomas*, 79 Wn. App. at 33-34 (describing plea agreement of at least three pages in length). Neither court was construing the plea statement form's prosecutorial recommendation line.

That is not surprising since the standard plea statement form has no place for stating the defendant's obligations under a plea agreement; indeed, the only prosecutorial obligation is to state the prosecutor's recommendations to the court. CrR 4.2(g)(6)(g). Recommendations typically address such matters as sentence length, special conditions of community supervision, restitution, and the like. The purpose of the plea form is to

---

[1] At the time of the guilty plea entered in this case, the line in the standard plea form for the prosecutor's recommendations was found at CrR 4.2(g)(6)(f). *See* 116 Wn.2d at 1108 (1991) (adopting amendments to CrR 4.2(g)). That portion of the form is now in paragraph (6)(g). *See* 142 Wn.2d at 1105 (2000). I cite to the current location in this opinion for convenience.

ensure that the defendant understands what rights he is giving up and the sentence that the prosecutor will be seeking. It is not a contract and it does not explain what obligations the defendant may have; rather, it is directed to advise the defendant of the direct consequences of pleading guilty.

It is quite obvious that here the parties had reached an agreement that included many features other than the prosecutor's recommendation of four consecutive low-end standard range terms for the four murders. The parties agreed to the declination of jurisdiction to adult court. The plea statement form is silent on that point. Immediately after accepting the waiver of the declination hearing and assigning the matter to adult court, the juvenile judge switched hats and announced he was now sitting in adult court. The court then accepted the new information charging four counts of first degree murder. These charges were different than the aggravated first degree murder charges filed in juvenile court. Again, the plea statement form does not address these lesser counts or any obligation of the prosecutor to file new lesser offenses.

In addition, the defense agreed to the prosecutor's recommended sentence:

> Your Honor, at this time, we would urge the court to follow the recommendation of the prosecutor, that recommendation being one that has been accepted by Mr. Ramos.

Report of Proceedings (Aug. 23, 1993), *State v. Ramos*, No. 25740-1-III (RP), at 27

(Wash. Ct. App.). On the next page, defense counsel again stated: "Eighty years is what

my client accepts." *Id.* at 28. She also submitted documents tending to suggest that the

codefendant was the leader of the criminal activity. She did this *in support of the*

*recommended sentence. Id.* at 27-29 (emphasis added).[2] After filing the documents,

counsel asked the court to sentence her client to 80 years. *Id.* at 30.

The only way to read this record is that the parties anticipated there would be no

challenge to the minimum standard sentence recommendation and that both parties would

support it.[3] Most certainly counsel would have made a pitch for an exceptional sentence

if it was within the realm of the agreement. Instead, she asked the court for 80 years. *Id.*

at 30. The defendant's family was present and his counsel told the court they asked for

mercy for Mr. Ramos. The prosecutor reported that the victims' surviving family

members could not be present, but they also supported the 80-year sentence. *Id.*

---

[2] "I'm now presenting to the court those materials. We would ask the court to consider these and sentence Joel Ramos to the bottom end of the standard range, 80 years." RP at 30.

[3] It also is inconceivable that a prosecutor would accept an exceptional sentence of 20 years for the brutal killings of a young family that was repeatedly described as one of the most heinous offenses in the history of the county. No prosecutor, let alone the long-time elected prosecutor who personally handled the case, would negotiate a minimum sentence for the crime and leave open the possibility that the defendant could ask for additional mercy. If that was in the works, it most certainly would have been raised to the trial judge.

There is no way to read this record other than that the parties had agreed to jointly recommend 80 years. It is understandable that the prosecutor argues now that Mr. Ramos violated the plea agreement at the most recent sentencing hearing; the evidence in support of that view is overwhelming. However, this court does not find facts. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 575, 343 P.2d 183 (1959); *Quinn v. Cherry Lane Auto Plaza, Inc.*, 153 Wn. App. 710, 717, 225 P.3d 266 (2009). It was the trial court's job to determine the existence and parameters of the plea agreement. It did not do so, probably because the court was inclined to follow the original recommendation of the parties. However, as the majority clearly shows, there was some ambiguity in the court's remarks concerning its sentencing authority. A plea agreement does not bind a judge; he was free to consider an exceptional sentence. Whether Mr. Ramos was permitted to ask for one in light of the agreement will need to be determined if he persists in making the argument on remand.[4] That question is one for the trial court, not this court.

I concur.

Korsmo, C.J.

---

[4] There is nothing to prohibit the prosecutor from arguing against an exceptional sentence (while maintaining its 80-year recommendation), and Mr. Ramos's actions in slaughtering a young boy in order not to leave any witnesses seriously undercut his argument that he was a follower rather than an equally culpable actor. A full resentencing could just as easily result in a standard range sentence of 106 years rather than the 80 years recommended by the prosecutor.